1
2
3
4
5
6
7
8              IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CARL MONTIGUE LEWIS,

11              Petitioner,              No. CIV S-03-1410 GEB EFB P

12        vs.

13   DAVID L. RUNNELS,

14              Respondent.            ORDER SETTING EVIDENTIARY HEARING
     _____/

15

16        Petitioner is a state prisoner proceeding *in propria persona* with an application for a writ

17   of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a 1999 judgment of

18   conviction entered against him in Sacramento County Superior Court on charges of first degree

19   felony murder and first degree burglary.  One of petitioner's claims for relief is that his

20   conviction must be reversed because the prosecutor exercised peremptory challenges to strike

21   two jurors on the basis of race, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).  For the

22   reasons explained below, this court will order an evidentiary hearing on petitioner's *Batson*

23   claim.

24   ////

25   ////

26   ////

1

**I. Background**

The state court record reflects that there were four African-American prospective jurors in the pool of 100 persons summoned for petitioner's trial.  Augmented Reporter's Transcript on Appeal (ART) at 7-15, 143.  The trial court randomly called 18 of the 100 jurors into the jury box for voir dire.  *Id.* at 15.  Of these 18 jurors, only Sallie T. was African-American.  *Id.* at 7-15, 143.  During voir dire, the following colloquy occurred between the trial judge and Sallie T:

> Q.  Okay.  Have we covered everybody's relatives or friends or someone very close to you who has been in trouble with the law in this area?
>
> Yes, Ms. T[]?
>
> A.  Oh, I have numerous people in jail in my family.
>
> A.  In jail?
>
> Q.  For armed robbery, muggings.
>
> Q.  Okay.  These are people, brothers?
>
> A.  Cousins.
>
> Q.  Cousins?
>
> A.  Cousin, yeah.
>
> Q.  Let me ask you, Ms. T[].  This is all in the Sacramento County area?
>
> A.  Yes.
>
> Q.  And was there ever any feeling that you had during these circumstances, that your cousins or family members were being unfairly treated by the authorities in any way?
>
> A.  No.
>
> Q.  And do you think because your family members have been in trouble with the law, that it's going to affect your ability to be fair in this case in any way?
>
> A.  No.

*Id.* at 30-31.

2

1   The prosecutor used his third peremptory challenge to exclude Sallie T from the jury.  *Id.*

2   at 92-93.  At this point, defense counsel made a joint challenge to the prosecutor's challenge to

3   Sallie T. pursuant to *People v. Wheeler*, 22 Cal.3d 258 (1978).[1]  ART at 93, 104.  The trial court

4   denied the challenge, ruling as follows:

5           THE COURT:  All right.  On the record outside the presence of the
            jury.  Mr. Holmes, you wanted to put on the record –
6
            MR. HOLMES (counsel for petitioner's co-defendant Adams):
7           Yes, Your Honor, the prosecution excused a Ms. T[], I forgot what
            seat she's in, I think seat –
8
            THE COURT:  Seven or eight.
9
            MR. HOLMES:  – Eight, and we would like to lodge a *Wheeler*
10          objection on that at this time.

11          THE COURT:  The Court heard the objection at side bar, is
            satisfied a prima facie case has not been made, so I will deny the
12          motion at this time.

13  *Id.* at 104.[2]

14          Veronica M. was the second black prospective juror to be called into the jury box for voir

15  dire.  *Id.* at 97, 143.  During voir dire, Veronica M. stated that her brother worked for the

16  Department of Corrections, she had lived in Sacramento for "20 plus years," she was employed

17  with the California Department of Disability Adult Program Services, and she thought she could

18  be a fair juror.  *Id.* at 97, 101.  The prosecution used its tenth peremptory challenge to remove

19

20

21          [1]   In *Wheeler*, the California Supreme Court held that peremptory challenges may not be
22  used to exclude from a jury all or most members of a cognizable group solely on the ground of
    presumed "group bias."  *Wheeler* is "the California counterpart to *Batson.*"  *Yee v. Duncan*, 463 F.3d
23  893, 896 (9th Cir. 2006).  Although petitioner made his motion pursuant to *Wheeler*, the standards
    set forth in *Batson* control this court's disposition of this case.  *Kesser v. Cambra*, 465 F.3d 351 (9th
24  Cir. 2006).

25          [2]   The record reflects that immediately after the prosecutor excused Sallie T., all defense
26  counsel asked permission to approach the bench, at which time an unreported discussion occurred.
    *Id.* at 93.  The *Wheeler* objection was apparently discussed during that unreported sidebar
    conference.

3

1   Veronica M.  *Id.* at 118.  At that point, the defense made another *Wheeler* challenge.  *Id.*[3]

2        Outside the presence of the jury, the following discussion occurred relative to that

3   challenge:

>    THE COURT:  All right.  And then with the challenge to Ms. M[],
>    juror number ten, and the previous challenge to Ms. T[], juror
>    number eight, both of whom were black, the Court has entertained
>    at side bar a *Wheeler* motion by the defense, joined in by all sides.
>    The Court is still not satisfied based upon its determinations here
>    of the questionnaires and the like that there have been a *Wheeler*
>    violation or a prima facie case shown at this time.
>
>    So I'm going to not require the district attorney to state his
>    reasons.
>
>    MR. PETERS:  Your Honor, could I be heard on that?
>
>    THE COURT: You certainly may, Mr. Peters.
>
>    MR. PETERS:  Your Honor, I'd like to state that I believe we had
>    a hundred people on the panel.  I think there were four Blacks to
>    start.  I'm not positive, but that's what I counted.
>
>    THE COURT:  That's what I counted.
>
>    MR. PETERS:  And he has excused two of the four.  And whether
>    or not the other ones will come up, I don't know, because of the
>    amount of challenges that we've had to use here, the defense
>    challenges.  So, I mean, Miss Wilson has advised me that we've
>    used our 20.
>
>    THE COURT:  I have you having used 20, right.
>
>    MR. PETERS:  So it seems to me that I think some showing
>    should be required of Mr. Sawtelle at this point because of the fact
>    that there's such a low number of Blacks on the panel that we
>    have, and he has excused two of them so far.
>
>    And I think one of them, that last one had a good friend in the
>    CDC or something as I recall, but I just wanted to state that.
>
>    THE COURT:  I don't think that was his reason.
>
>    MR. PETERS:  I don't know what his reason was.

---

[3]  This second *Wheeler* challenge was also discussed during an unreported sidebar
conference.  *Id.*

THE COURT:  Well, looking at the questionnaire I can discern one.

MR. MASUDA (counsel for co-defendant Hall):  Well, your Honor –

THE COURT:  I'm not sure whether I should state that for the record what I discern.

MR. MASUDA:  What I saw –

THE COURT:  I think you have to have a prima facie case of bias before I require him to enunciate his, and I don't think I have to enunciate it for him.

MR. MASUDA:  Well, all I'm saying with respect to the questionnaire, I saw on there where she had sat on previous jury duty, and the indication was that they did not reach a verdict.

THE COURT:  Right.

MR. MASUDA:  But that's also true with Mr. Medina who the district attorney did pass on.

THE COURT:  I'm not sure what his ultimate choice was.

MR. MASUDA:  That's the only thing I could see on the questionnaire where I would think the person would knock off –

THE COURT:  Mr. Medina was a minority as well, but Hispanic.

MR. MASUDA:  But Hispanic, I think a big difference here since we have three young Black men.  But I know he did pass on the panel when Mr. Medina was in the, was in the box.

And Mr. Medina has a questionnaire filled out that he sat on a criminal case in 1990 or '88, and they were not able to reach a verdict.

So I think that in itself with the questionnaire, and the fact that two out of the three [sic] prospective jurors, Black jurors have been excused by district attorney would be a sufficient showing.

THE COURT:  I'm going to deny the motion at this time.

*Id.* at 142-45.  The record does not reveal whether petitioner's jury contained any African-American jurors.

////

**II. State Court Decision**

On direct appeal, petitioner argued that his constitutional rights were violated by the prosecutor's improper use of peremptory challenges to exclude Sallie T. and Veronica M. from the jury.  The California Court of Appeal denied petitioner's *Batson*/*Wheeler* claim with the following reasoning:

> Lewis and Adams are African-American, as were four of the 100 prospective jurors in the jury panel.  During the jury selection process, the prosecution used two of its peremptory challenges to excuse two African-American women.  The defendants objected each time, based on *People v. Wheeler*, (1978) 22 Cal.3d 258.  The trial court, however, found there was no prima facie showing of group bias and overruled the defendants' objections without requiring the prosecutor to state reasons for exercising the peremptory challenges.[4]
>
> The defendants assert the trial court erred in finding they had not made a prima facie showing that the prosecution violated their constitutional rights under *People v. Wheeler, supra*, 22 Cal.3d 258 and *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69].  They contend the trial court applied the wrong legal standard in determining whether a prima facie showing had been made and improperly found such showing had not been made.  These contentions are without merit.
>
> "'It is well settled that the use of peremptory challenges to remove prospective jurors solely on the basis of a presumed group bias based on membership in a racial group violates both the state and federal Constitution.'  [Citations.]  Under *Wheeler* and *Batson*, '"[i]f a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court.  First, . . . he should make as complete a record of the circumstances as is feasible.  Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule.  Third, from all the circumstances of the case he must show a strong likelihood [or reasonable inference] that such persons are being challenged because of their group association . . . ."'  [Citations.]"  (*People v. Box* (2000) 23 Cal.4th 1153, 1187-1188.)

////

---

[4]   The record does not reflect whether the two remaining African-American prospective jurors eventually served on the jury.

The California Supreme Court has declared, in *People v. Box, supra,* 23 Cal.4th at pg. 1188, footnote 7, that, in order to determine whether there is a prima facie showing of group bias under *People v. Wheeler, supra,* 22 Cal.3d 258, the court must determine whether a *reasonable inference* arises that peremptory challenges are being used on the ground of group bias.  This declaration resolved a split in Court of Appeal decisions.  In *People v. Fuller* (1982) 136 Cal.App.3d 403, Division One of the Fourth Appellate District, presaging *Box*, decided that the proper standard was whether there arose a *reasonable inference* of group bias.  In *People v. Bernard* (1994) 27 Cal.App.4th 458, however, Division One of the Fourth Appellate District disagreed with *Fuller* and held that the proper standard was whether a *strong likelihood of group bias* had been shown.

There is no indication in the record concerning which standard the trial court used in concluding there was no prima facie showing of group bias.  Because *Box* was decided after the trial in this case, the defendants assert the trial court was bound, under stare decisis, by *Bernard* and therefore applied the improper standard.  To the contrary, stare decisis did not bind the trial court to apply the improper *Bernard* standard.  When opinions of the Court of Appeal conflict, the trial court must apply its own wisdom to the matter and choose between the opinions.  (*McCallum v. McCallum* (1987) 190 Cal.App.3d 308, 315, fn. 4.)  "As a practical matter, a superior court ordinarily will follow an appellate opinion emanating from its own district even though it is not bound to do so.  Superior courts in other appellate districts may pick and choose between conflicting lines of authority.  This dilemma will endure until the Supreme Court resolves the conflict, or the Legislature clears up the uncertainty by legislation."  (*Ibid.*)

Because the trial court was not bound by *Bernard* and there is no indication that the court applied the improper standard, we will not presume so.  Instead, we presume correctness.  (*See* Evid. Code, 664 [presuming official duty performed].)  An appellant bears the burden of affirmatively showing error on appeal.  (*See People v. Coley* (1997) 52 Cal.App.4th 964, 972.)  The defendants have not done so here.

The defendants also assert the trial court erred in finding that no reasonable inference of bias existed.  "'When a trial court denies a *Wheeler* motion because it finds no prima facie case of group bias was established, the reviewing court considers the entire record of voir dire.' [Citation.]  'If the record "suggests grounds upon which the prosecutor might reasonably have challenged" the jurors in question, we affirm.'"  (*People v. Box, supra,* 23 Cal.4th at p. 1188.)  Contrary to the defendants' suggestion, the prosecutor had reasonable grounds to challenge the African-American prospective jurors.

7

During general questioning of the prospective jurors concerning whether a family member had been charged with a crime, Sallie T., one of the African-American prospective jurors, responded: "Oh, I have numerous people in jail in my family." She further explained her cousins were incarcerated for armed robbery and muggings in Sacramento County. While she asserted she would not be biased as a result of her family situation, the fact she had family members incarcerated for crimes in Sacramento County was a ground for a reasonable challenge by the prosecutor because it was evidence that she could be biased against the prosecution. (*See People v. Douglas* (1995) 36 Cal.App.4th 1681, 1689 [finding reasonable use of peremptory challenge when family members of prospective juror had criminal records].)

Veronica M., another African-American prospective juror, had previously served on a jury that did not reach a verdict. She was a long-time Sacramento resident, who works for the state and has a brother who is an employee of the Department of Corrections. She also felt she could be a fair juror; however, the prosecution was justified in challenging her because of the inference that she might have been the cause of the prior hung jury and could do the same in this trial. (*See People v. Rodriguez,* (1999) 76 Cal.App.4th 1093, 1114 [finding reasonable use of peremptory challenge when prospective juror served on prior hung jury].)

Defendants protest that the prosecutor did not challenge another prospective juror who had previously been a juror in a case in which the jury did not reach a verdict. The *Box* court responded to a similar contention as follows: "Defendant argues, however, that these and the other bases stated by the prosecutor are insufficient because the prosecutor did not excuse other non-Black jurors who displayed similar characteristics. 'However, we have previously rejected a procedure that places an "undue emphasis on comparisons of the stated reasons for the challenged excusals with similar characteristics of nonmembers of the group who were not challenged by the prosecutor," noting that such a comparison is one-sided and that it is not realistic to expect a trial judge to make such detailed comparisons midtrial.' [Citations.] 'In addition, we have observed that "the same factors used in evaluating a juror may be given different weight depending on the number of peremptory challenges the lawyer has at the time of the exercise of the particular challenge."' [Citation.] 'Moreover, "the very dynamics of the jury selection process make it difficult, if not impossible, on a cold record, to evaluate or compare the peremptory challenge of one juror with the retention of another juror [who] on paper appears to be substantially similar."' [Citation.]" (*People v. Box, supra,* 23 Cal.4th at p. 1190.)

Additionally, the defendants claim the prosecutor's challenges were suspect because he exercised them against African-American *women*. The analysis is the same, however. There were grounds

8

1        for a reasonable challenge.

2        The trial judge, having participated in the jury selection process,
         was in the best position to determine under all the relevant
3        circumstances whether there was a reasonable inference the
         African-American prospective jurors were challenged because of
4        their group association.  (*See People v. Box, supra,* 23 Cal.4th at p.
         1189.)  Because there were grounds for reasonable challenges
5        against the African-American prospective jurors, we conclude
         there was no error.

6    Opinion at 21-26.

7    **III.  Federal Legal Standards**

8            Purposeful discrimination on the basis of race in the exercise of peremptory challenges

9    violates the Equal Protection Clause of the United States Constitution.  *Batson*, 476 U.S. at 89;

10   *Johnson v. California*, 545 U.S. 162 (2005).  So-called *Batson* claims are evaluated pursuant to a

11   three-step test:

12
13       First, the movant must make a prima facie showing that the
         prosecution has engaged in the discriminatory use of a peremptory
         challenge by demonstrating that the circumstances raise "an
14       inference that the prosecutor used [the challenge] to exclude
         veniremen from the petit jury on account of their race."  [Citation
15       omitted.]  Second, if the trial court determines a prima facie case
         has been established, the burden shifts to the prosecution to
16       articulate a [gender]-neutral explanation for challenging the juror
         in question.  [Citation omitted.]  Third, if the prosecution provides
17       such an explanation, the trial court must then rule whether the
         movant has carried his or her burden of proving the existence of
18       purposeful discrimination.

19   *Tolbert v. Gomez*, 190 F.3d 985, 987-88 (9th Cir. 1999) (en banc).  The burden of persuasion

20   regarding discriminatory motivation "rests with, and never shifts from, the opponent of the

21   strike.'"  *Yee*, 463 F.3d at 898 (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995)).

22           This court will evaluate petitioner's *Batson* claim with reference to the standards set forth

23   above.

24   ////

25   ////

26   ////

                                        9

**IV.  Standard of Review**

Petitioner argues that the decision of the California Court of Appeal rejecting his *Batson* claim is contrary to federal law because the appellate court used an incorrect legal standard in determining whether he had established a prima facie case.  Pet. at 43-44.  Accordingly, petitioner argues, this court must evaluate his *Batson* claim *de novo*.  *Id.*

In *Wade v. Terhune*, 202 F.3d 1190, 1195-97 (9th Cir. 2000), the Ninth Circuit Court of Appeals compared the standards articulated in *Wheeler* and *Batson* with regard to the establishment of a prima facie case.  The court noted that *Batson* required only that "the defendant must demonstrate that the facts and circumstances of the case 'raise an inference' that the prosecution has excluded venire members from the petit jury on account of their race."  *Id.* at 1195.  *Wheeler*, in contrast, decided by the California courts eight years before *Batson*, demanded that the defendant "'show a strong likelihood' that the prosecutor had excluded venire members from the petit jury on account of their race."  *Id.* at 1195-96.  The court in *Wade* concluded that "*Batson* and *Wheeler* thus may be thought to prescribe different tests for establishing a prima facie case."  *Id.* at 1196.  The court noted, however, that California courts disagreed as to whether the two phrases actually referred to the same standard.  *Compare People v. Fuller*, 136 Cal.App.3d 403, 423 (1982) (holding that the two phrases referred to the same standard) and *People v. Bernard*, 27 Cal.App.4th 458 (1994) (holding that the "strong likelihood" test was in fact a less stringent standard than the "reasonable inference" test.)  The court in *Wade* concluded that from the date of the *Bernard* decision forward, "the California state courts ha[d] applied a lower standard of scrutiny to peremptory strikes than the federal Constitution permits."  202 F.3d at 1196-97.

In *People v. Box*, 23 Cal.4th 1153, 1188 n.7 (2000), the case relied on by the California Court of Appeal in rejecting petitioner's *Batson* claim, the California Supreme Court acknowledged *Wade* and explained that "in California, a 'strong likelihood' means a 'reasonable ////

10

1    inference .'"  *Box* disapproved *Bernard* to the extent it was inconsistent with *Wheeler*.[5]  *Id.*

2    Subsequently, in *People v. Johnson*, 30 Cal.4th 1302 (2003), the California Supreme Court

3    clarified that the strong likelihood/reasonable inference standard articulated in *Box* meant that to

4    state a prima facie case of discrimination under *Batson/Wheeler*, a defendant must show that it

5    was "more likely than not" that the prosecutor's peremptory challenge was based on group bias.

6    *Id.* at 1313, 1318.  *People v. Johnson* was subsequently reversed by *Johnson v. California*, 545

7    U.S. 162 (2005), wherein the United States Supreme Court rejected the "more likely than not"

8    standard articulated by the California courts.[6]  The Supreme Court explained:

9               The question before us is whether *Batson* permits California to
                require at step one that "the objector must show that it is more
10              likely than not the other party's peremptory challenges, if
                unexplained, were based on impermissible group bias." 30 Cal.4th,
11              at 1318, 1 Cal.Rptr.3d 1, 71 P.3d, at 280.  Although we recognize
                that States do have flexibility in formulating appropriate
12              procedures to comply with *Batson*, we conclude that California's
                "more likely than not" standard is an inappropriate yardstick by
13              which to measure the sufficiency of a prima facie case.

14   *Johnson v. California*, 545 U.S. at 168.

15          In light of the current state of the law, it appears that the California Court of Appeal

16   employed the incorrect legal standard in determining whether petitioner had established a prima

17   facie case of racial discrimination in jury selection.  Specifically, the state court relied heavily on

18   the rule articulated in *Box*, which has since been rejected by the United States Supreme Court in

19   *Johnson*.  Because the state court utilized the wrong legal standard, this court will analyze

20   petitioner's *Batson* claim *de novo*.  *See Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. 2004)

21   (federal court of appeals examined *Batson* claim de novo because the state court used the wrong

22   legal standard when analyzing whether defendant made a prima facie showing of bias); *Wade*,

23

24          [5]   As noted by the California Court of Appeal, *Box* was decided after petitioner's trial,
     which occurred during a period when *Bernard* was still good law in California.

25
26          [6]   The holding in *Johnson* may be applied retroactively.  *Boyd v. Newland*, 467 F.3d 1139,
     1145-46 (9th Cir. 2006), *cert. denied* 127 S.Ct. 2249 (2007).

1   202 F.3d at 1195 (holding that when the state court uses the wrong legal standard, the rule of

2   deference required by 28 U.S.C. § 2254(d)(1) does not apply).

3          Petitioner also argues that the decision of the California Court of Appeal was contrary to

4   federal law because the state appellate court refused to consider comparative evidence in the

5   record in its analysis of petitioner's *Batson* claim.  Pet. at 43-44.  Indeed, the California Court of

6   Appeal specifically declined to conduct a comparative analysis of jurors who were seated and

7   jurors who were excused in rendering its opinion.  Opinion at 25-26.  In *Boyd*, the United States

8   Court of Appeals for the Ninth Circuit held that "under the clearly established Supreme Court

9   precedent of *Batson*, comparative juror analysis is an important tool that courts should utilize on

10  appeal when assessing a defendant's plausible *Batson* claim."  467 F.3d at 1150.  In reaching this

11  decision, the court in *Boyd* assumed, without deciding, that a comparative juror analysis should

12  be undertaken even in circumstances where the trial court ruled that the defendant failed to make

13  a prima facie showing at the first step of the *Batson* analysis.  *Id.* at 1149.  The court also stated

14  that the threshold for establishing a prima facie *Batson* claim is "quite low."  *Id.* at 1145.

15         This court agrees with petitioner that the state court's failure to conduct a comparative

16  analysis of seated jurors with excused jurors in conducting its analysis of petitioner's *Batson*

17  claim is contrary to federal law.  *Boyd*, 467 F.3d at 1149; *Kesser v. Cambra*, 465 F.3d 351, 358

18  (9th Cir. 2006) ("We hold that the California courts, by failing to consider comparative evidence

19  in the record before it that undeniably contradicted the prosecutor's purported motivations,

20  unreasonably accepted his nonracial motives as genuine").  This unreasonable application of

21  clearly established United States Supreme Court precedent in failing to conduct a comparative

22  analysis of the seated jurors with the excused jurors, is further reason for this court to examine

23  petitioner's *Batson* claim *de novo*.  *See Panetti v. Quarterman* ___ U.S. ___, 127 S.Ct. 2842,

24  2858 (2007) (when a state court's adjudication of a claim "is dependent on an antecedent

25  unreasonable application of federal law," a federal court must "resolve the claim without the

26  deference AEDPA otherwise requires"); *Frantz v. Hazey*, 513 F.3d 1002, 1013 (9th Cir. 2008)

12

1  ("So it is now clear both that we may not grant habeas relief simply because of § 2254(d)(1)

2  error and that, if there is such error, we must decide the habeas petition by considering de novo

3  the constitutional issues raised").

4  **V.  Analysis**

5        Petitioner argues that the trial court erred in finding that he failed to demonstrate a prima

6  facie case of racial discrimination with respect to the prosecutor's peremptory challenge of Sallie

7  T. and Veronica M.  In order to establish a prima facie case of racial discrimination, petitioner

8  must show that "(1) the prospective juror is a member of a "cognizable racial group," (2) the

9  prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances

10  raises an inference that the strike was motived by race."  *Boyd*, 467 F.3d at 1143 (citing *Batson*,

11  476 U.S. at 96 and *Cooperwood v. Cambra*, 245 F.3d 1042, 1045-46 (9th Cir. 2001)).  A prima

12  facie case of discrimination "can be made out by offering a wide variety of evidence, so long as

13  the sum of the proffered facts 'gives rise to an inference of discriminatory purpose.'"  *Johnson*,

14  545 U.S. at 168 (quoting *Batson*, 476 U.S. at 93-94.)  "The defendant is entitled to rely on the

15  fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection

16  practice that permits 'those to discriminate who are of a mind to discriminate.'"  *Id.* at 169

17  (quoting *Avery v. Georgia*, 345 U.S. 559, 562 (1953)).  In considering the merits of petitioner's

18  claim, this court must consider the "totality of the relevant facts" and "all relevant

19  circumstances" surrounding the prosecutor's use of a peremptory strike as to these jurors,

20  *Batson*, 476 U.S. at 94, 96, and must analyze the context in which the peremptory strike arose.

21  *Johnson*, 545 U.S. at 173.  *See also Boyd*, 467 F.3d at 1146-47.  This should include a review of

22  the entire transcript of jury voir dire in order to conduct a comparative analysis of the jurors who

23  were stricken and the jurors who were allowed to remain.  *Boyd*, 467 F.3d at 1149 ("We believe,

24  however, that Supreme Court precedent requires a comparative juror analysis even when the trial

25  ////

26  ////

court has concluded that the defendant failed to make a prima facie case").[7]  "If a prosecutor's preferred reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Miller-El*, 545 U.S. at 241.  *See also Kesser*, 465 F.3d at 360 (the "totality of the relevant facts" includes "the characteristics of people [the prosecutor] did not challenge.").  "[A] defendant can make a prima facie showing based on statistical disparities alone."  *Paulino*, 371 F.3d at 1091.

The first and second elements of the test for determining whether a prima facie case has been made are met in this case.  Sallie T. and Veronica M. are African-American and the prosecutor used a peremptory challenge to remove them.  The issue presented is whether the trial court erred in failing to find an inference that the strikes of Sallie T. and Veronica M. were motivated by race, an inference sufficient to warrant an explanation from the prosecutor.[8]

////

_____

[7]  Comparative juror analysis refers to "an examination of a prosecutor's questions to prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise similar jurors differently because of their membership in a particular group."  *Boyd*, 467 F.3d at 1145.  *See also Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) (stating that "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve" was "more powerful" than bare statistics).

[8]  Petitioner argues that the prosecutor's exercise of peremptory challenges against two African-American women gives rise to an inference of bias based on gender because the prosecutor may have "discriminate[d] against African-American women based on the stereotype that the [sic] could not bring themselves to convict an African-American male, while that might not be the case for African-American male jurors."  Pet. at 46.  In *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 141-42 (1994), the United States Supreme Court held that gender as well as race is an impermissible basis for peremptory challenges.  However, in *Turner v. Marshall*, 63 F.3d 807, 812 (9th Cir. 1995), *overruled on other grounds* by *Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999) (en banc), the Ninth Circuit noted that "neither the Supreme Court nor the Ninth Circuit has recognized that the *combination of race and gender*, such as 'black males,' may establish a cognizable group for *Batson* purposes." (emphasis added).  Accordingly, the *Turner* court limited its examination of a *Batson* claim to whether the defendant had made "a prima facie case of impermissible exclusion of African-American jurors as a class, with no reference to gender." *Id.* at 812.  The court in *Turner* also declined to consider whether "black males" or "black women" constituted a "cognizable group" for purposes of *Batson* because, under *Teague v. Lane*, 489 U.S. 288, 299-300, 316 (1989), a new rule defining what constitutes a "cognizable group" could not be applied retroactively to the petitioner's case.  *Id.*  Based on the reasoning in *Turner*, this court will limit its inquiry into whether petitioner has made a prima facie case of impermissible exclusion of African-American jurors as a class, with no reference to gender.

1          In *Johnson v. California*, the United States Supreme Court discussed the level of proof

2   necessary to establish a prima facie case under *Batson*.[9]  545 U.S. at 168.  In *Johnson*, the

3   prosecutor used three of his peremptory challenges to eliminate the only African-American

4   prospective jurors from the jury pool.  *Id.* at 164.  The defense raised a *Batson* challenge after the

5   second and third strikes against black jurors.  *Id.*  The trial judge ruled after each challenge that

6   the defense had not established a prima facie case of racial bias, concluding from his own

7   observations that the prosecutor's strikes could be justified by race-neutral reasons.  The

8   Supreme Court concluded that in order to demonstrate a prima facie case, the defense was only

9   required to "produc[e] evidence sufficient to permit the trial judge to draw an inference that

10  discrimination has occurred."  *Id.* at 170.  The court explained:

11              We did not intend the first step to be so onerous that a defendant
                would have to persuade the judge – on the basis of all the facts,
12              some of which are impossible for the defendant to know with
                certainty – that the challenge was more likely than not the product
13              of purposeful discrimination.  Instead, a defendant satisfies the
                requirements of *Batson's* first step by producing evidence
14              sufficient to permit the trial judge to draw an inference that
                discrimination has occurred.

15

16  *Id.* at 170.  In *Johnson*, the court concluded that two "inferences of discrimination" present in

17  that case were sufficient to establish a prima facie case under *Batson*: the fact that the trial judge

18  pronounced the issue "very close," and the fact that "all three African-American prospective

19  jurors were removed from the jury."  *Id.* at 173.

20          In the instant case, as in *Johnson*, defense counsel objected on behalf of all defendants

21  each time the prosecutor challenged a member of the cognizable group and argued he had

22  established a prima facie case of discrimination.  After the challenge to Veronica M., counsel

23  argued that: (1) the prosecutor had excused two out of the only four African-American potential

24

25          [9]     In *Batson*, the Supreme Court held that because the petitioner had timely objected to the
        prosecutor's striking of "all black persons on the venire," the trial court erred when it "flatly rejected
        the objection without requiring the prosecutor to give an explanation for his action."  476 U.S. at
26      100.

jurors on the panel; (2) it was not a certainty that the other two black jurors would be called for voir dire before the jury was finalized; (3) one of the excused jurors had a relative who was employed by the Department of Corrections (which presumably would otherwise make her an attractive juror for the prosecution); and (4) the prosecutor had accepted another juror who had participated on a hung jury, thereby eliminating the only valid reason to excuse Veronica M. ART at 143-44.  Despite these objections, the trial court made no effort to seek the prosecutor's actual reasons behind the peremptory challenges of these two jurors.

At the time Veronica M. was excused, the prosecutor had eliminated the only African-American potential jurors from the initial pool of 25 jurors who had been called for voir dire. *Id.* at 15, 94.  By doing this, he had eliminated 50% of the black jurors in the entire 100 person jury pool.  It was certainly possible that neither of the remaining black jurors would be called for voir dire before the jury was fully composed, leaving no African-American jurors on petitioner's jury.  Petitioner and his co-defendants were black, and their victim was an elderly white woman. This scenario gives rise to an inference of racial bias in jury selection.  *See Williams v. Runnels*, 432 F.3d 1102, 1107 (9th Cir. 2006) (defendant established an inference of racial discrimination under *Batson* based on statistical analysis alone, where defendant was African-American, the prosecutor used three of his first four peremptory challenges to remove African-Americans from the jury panel and only four of the first forty-nine potential jurors were African-American); *Paulino*, 371 F.3d at 1091 (inference of bias where prosecutor used five out of six peremptory challenges to strike African-Americans; case remanded for prosecution to provide race-neutral reasons for the exclusion of these jurors); *Fernandez v. Roe*, 286 F.3d 1073, 1077-80 (9th Cir. 2002) (inference of bias where four out of seven Hispanics and two blacks were excused by the prosecutor); *Turner*, 63 F.3d at 812 (prima facie showing where prosecutor challenged five out of a possible nine African-American jurors).  *See also United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir.1994) (the Constitution "forbids striking even a single prospective juror for a discriminatory purpose").

1    The court will consider whether any other relevant circumstances refute the inference of

2    discrimination raised by the statistical disparity present in this case.  *See Williams*, 432 F.3d at

3    1107 (when reviewing a *Batson* claim, a court should continue to consider "any other relevant

4    circumstances" brought to its attention that may support or refute an inference of discriminatory

5    purpose, including an inference from statistical disparity).  One relevant circumstance is a

6    comparative juror analysis.  *Boyd*, 467 F.3d at 1145.  *See also Kesser*, 465 F.3d at 360 (the

7    "totality of the relevant facts" includes "the characteristics of people [the prosecutor] did not

8    challenge.").  The record reflects that Veronica M. had participated in a prior trial which resulted

9    in a hung jury.[10]  However, the prosecutor kept a juror on the panel who had also participated in

10   a trial which resulted in a hung jury.  Accordingly, it appears unlikely that this was truly a factor

11   in the prosecutor's decision to excuse Veronica M.  Nothing else in the record provides an

12   obvious reason for the prosecutor to legitimately excuse Veronica M.

13   Another relevant circumstance is "the prosecutor's questions and statements during voir

14   dire examination and in exercising his challenges."  *Batson*, 476 U.S. at 96-97.  The prosecutor

15   in this case did not make any statements during voir dire or when the *Batson* challenges were

16   made.  Accordingly, this court has no insight into his reasons for striking Sallie T. and Veronica

17   M.  On the state of the record before this court, no other circumstances rebut the inference of

18   discrimination arising from the prosecutor's strike of the only two African-American jurors in

19   the initial jury pool.

20   The absence of any non-discriminatory explanation from the prosecutor for his strike of

21   these two jurors, under circumstances that call for such an explanation, is at the core of the

22   problem here.  It places in factual context the inadequacy of the erroneous standard applied by

23   the state court.  The California appeals court relied on *Box* in finding no prima facie showing

24

25   [10]  Respondent has lodged with this court the juror questionnaires for the jurors who served
     on petitioner's jury, but not for those jurors who were stricken.  Accordingly, this court must rely
26   on the trial record to determine the content of the challenged jurors' questionnaires.

and, therefore, no requirement for the prosecutor to articulate a non-discriminatory explanation for striking the black jurors.  That case, *Box*, attempts to reconcile the U.S. Supreme Court standard of "reasonable inference" with California's more exacting standard by the assertion that "in California, a 'strong likelihood' means a 'reasonable inference.'"  The struggle to do so could not overcome the obvious semantical tension in attempting to equate the two standards. Indeed, as discussed above, the California Supreme Court strived again to minimize the conflict of the state standard with that established by the U.S. Supreme Court by concluding that the language in *Box* means that before the prosecutor must explain the strike of the black juror(s) a defendant is first required to show that it was "more likely than not" that the prosecutor's peremptory challenge was based on race.  *People v. Johnson*, 30 Cal.4th 1302 (2003); *Id.* at 1313, 1318.  However, the effort to reconcile the irreconcilable standards in ths way was expressly rejected by the U.S. Supreme court in *Johnson v. California*, 545 U.S. at 168 ( "we conclude that California's 'more likely than not' standard is an inappropriate yardstick by which to measure the sufficiency of a prima facie case."), which brings us back to the core problem of the state court not requiring an explanation.

It is apparent here that the trial court and the state appeals court were imposing a standard that required the defendant to show more than circumstances sufficient to raise an inference. Rather, they applied a standard that required the defendant to negate any possible non-discriminatory explanation that the court might imagine.  Thus, in spite of the trial court's refusal to ask for an explanation, the appeals court concludes:

> If the record "suggests grounds upon which the prosecutor *might reasonably have challenged*" the jurors in question, we affirm.'" (*People v. Box, supra*, 23 Cal.4th at p. 1188.)  Contrary to the defendants' suggestion, the prosecutor had reasonable grounds to challenge the African-American prospective jurors."

Opinion at 24.  The speculation aside, whatever the true grounds of the prosecutor's strikes, he was never required to state them.  As the U.S. Supreme Court has made clear, it is decidedly not the role of the reviewing court to supply an explanation.

1    The California Court of Appeal discussed several reasons the prosecutor might have had

2 in mind when he dismissed these two jurors based on Sallie T.'s answers during voir dire and

3 Veronica M.'s responses on the questionnaire.  However, reliance on speculation as to a possible

4 non-discriminatory reason for the exclusion is contrary to the Supreme Court's admonition in

5 *Johnson* that when determining whether a prima facie case has been established, a judge should

6 not "engag[e] in needless and imperfect speculation [about the prosecutor's reasons for

7 excluding a juror] *when a direct answer can be obtained by asking a simple question*."  545 U.S.

8 at 172 (emphasis added).  Quite simply, if circumstances are sufficient to raise an inference that

9 race may well have been a consideration the prosecutor should be asked for his explanation and

10 it should it should not be supplied for him through speculation by the reviewing court.  If a race

11 neutral explanation for excluding a juror is articulated, the court, under step three of the *Batson*

12 framework analysis, must determined whether that explanation is worthy of credence; i.e.

13 whether it is pretextual to mask a discriminatory motive.  *Miller El,* 545 U.S. at 252 ("[i]f the

14 stated reason does not hold up, its pretextual significance does not fade because a trial judge, or

15 an appeals court, can imagine a reason that might not have been shown up as false"); *Paulino*,

16 371 F.3d at 1090 ("[I]t does not matter that the prosecutor might have had good reasons . . .

17 [w]hat matters is the real reason they were stricken"); *Holloway v. Horn*, 355 F.3d 707, 725 (3rd

18 Cir. 2004) (speculation "does not aid our inquiry into the reasons the prosecutor actually

19 harbored" for a peremptory strike).  There is no evidence in the record that the prosecutor struck

20 Sallie T. and Veronica M. from the jury based on the considerations suggested by the state

21 appellate court or the trial court.

22    Here, petitioner has produced evidence sufficient to permit the trial judge to draw an

23 inference that the prosecutor struck Sallie T. and Veronica M. from the initial venire because of

24 their race.  *See Johnson*, 545 U.S. at 170.  Because petitioner has demonstrated that the facts give

25 rise to an inference of discriminatory purpose, making a prima facie case, the burden shifts to the

26 state to explain the racial exclusion by offering permissible race-neutral justifications for the

strikes.  The trial court did not require the prosecutor to explain his peremptory challenges, apparently relying instead on its own speculation as to what might have been the prosecutor's reasons.  Nor did the state courts hold an evidentiary hearing on petitioner's *Batson* claim.

Pursuant to the AEDPA, an evidentiary hearing is appropriate under the following circumstances:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
> (A) the claim relies on –
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B)  the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

Various decisions of the Court of Appeals for the Ninth Circuit establish a three-step process to consider the propriety of an evidentiary hearing in federal court.  Initially, the court must "determine whether a factual basis exists in the record to support the petitioner's claims." *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir. 1999).  If the facts do not exist or are inadequate and a hearing might be appropriate, then

> [the] court's first task in determining whether to grant an evidentiary hearing is to ascertain whether the petitioner has "failed to develop the factual basis of a claim in State court."  If so, the court must deny a hearing unless the applicant establishes one of the two narrow exceptions set forth in §2254(e)(2)(A) & (B).  If, on the other hand, the applicant has not "failed to develop" the facts in state court, the district court may proceed to consider whether a hearing is appropriate, or required under <u>Townsend</u>.

20

1   *Id.*; *Insyxiengmay v. Morgan*, 403 F.3d 657, 669-70 (9th Cir. 2005) (same).

2      A petitioner will only be charged with a "failure to develop" the facts if "there is lack of

3   diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*

4   *v. Taylor*, 529 U.S. 420, 432 (2000). "Under AEDPA, 'a failure to develop the factual basis of a

5   claim is not established unless there is a lack of diligence, or some greater fault, attributable to

6   the prisoner or the prisoner's counsel.'" *Insyxiengmay*, 403 F.3d at 670 (quoting *Williams*, 529

7   U.S. at 432).

8      In the situation presented here, where the court has concluded that petitioner raised an

9   inference of racial discrimination in jury selection but the trial court did not move on to the

10  second and third *Batson* tests, federal courts generally remand for a further hearing at which the

11  prosecutor will be given the chance to explain the reasons for his exclusion of a particular juror.

12  *See Williams v. Runnels*, 432 F.3d at 1110  (ordering a remand for an evidentiary hearing "even

13  though the state represented to the district court that the prosecutor no longer remembers why he

14  utilized his peremptory challenges and could not locate the jury selection notes").  In *Batson*

15  itself, the Supreme Court remanded the matter and instructed, "[i]f the trial court decides that the

16  facts establish, prima facie, purposeful discrimination and the prosecutor does not come forward

17  with a neutral explanation for his action, our precedents require that petitioner's conviction be

18  reversed."  476 U.S. at 100.  *See also Miller-El*, 45 U.S. at 236 (reviewing a case in which the

19  state appellate court had "remanded the matter to the trial court to determine whether Miller-El

20  could show that prosecutors in his case peremptorily struck prospective black jurors

21  because of race"); *Paulino*, 371 F.3d at 1093 (remanding matter to the district court for an

22  evidentiary hearing); *Fernandez,* 286 F.3d at 1080 (same).

23      The State has never been required to present evidence of the prosecutor's actual,

24  non-discriminatory reasons for striking Sallie T. and Veronica M. from the jury.  Accordingly,

25  this court will hold a hearing so the State will have an opportunity to present evidence as to the

26  prosecutor's race-neutral reasons for the exclusion of these jurors and to determine whether the

1  prosecutor violated *Batson* in connection with the selection of petitioner's jury.

2      The court has determined that the interests of justice require appointment of counsel for

3  petitioner at the evidentiary hearing. *See* 18 U.S.C. § 3006A(a)(2)(B); *see also Weygandt v.*

4  *Look*, 718 F.2d 952, 954 (9th Cir. 1983).

5      Accordingly, good cause appearing, IT IS HEREBY ORDERED that:

6      1.   A member of the Federal Defender panel is appointed to represent petitioner.

7      2.  The Clerk of the Court is directed to serve a copy of the July 2, 2003 petition for writ

8  of habeas corpus and this order on Carolyn Wiggin, Assistant Federal Defender.

9      3.  Petitioner's counsel shall contact the Clerk's Office to make arrangements for  copies

10 of documents in the file.

11     4.  This matter is set for evidentiary hearing on January 5, 2009, at 10:00 a.m. before the

12 undersigned in Courtroom #25  .

13     5.  All parties shall appear at the evidentiary hearing by counsel.

14 DATED:  November 3, 2008

15

16                           EDMUND F. BRENNAN
17                           UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

                                22