1

2

3

4

5

6

7

8                       IN THE UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CARL MONTIGUE LEWIS,

11                Petitioner,              No. CIV S-03-1410 GEB EFB P

12        vs.

13   DAVID L. RUNNELS,

14                Respondent.              FINDINGS & RECOMMENDATIONS

15   _____/

16        Petitioner is a state prisoner proceeding through appointed counsel with an application

17   for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges a 1999 judgment of

18   conviction entered against him in Sacramento County Superior Court on charges of first degree

19   felony murder and first degree burglary.  He seeks relief on the grounds that, allegedly: (1) his

20   right to due process was violated by jury instruction error; (2) the evidence was insufficient to

21   support the burglary felony-murder special circumstance; and (3) his constitutional rights were

22   violated by the prosecutor's improper use of peremptory challenges to exclude two black women

23   from the jury.  Upon careful consideration of the record and the applicable law, the undersigned

24   recommends that petitioner's application for habeas corpus relief be denied.

25   ////

26   ////

1

## I.  Factual Background[1]

During the summer of 1998, Adams, 18 years old at the time, lived in the Pheasant Pointe Apartments in Sacramento. Lewis, who was 27 years old, frequently visited the same apartments, where he met and became friends with Adams. They also became acquainted with Jovan Hall.

*Robbery of Steve Baker*

On July 28, 1998, at about 1:00 a.m., Adams or Lewis kicked in the door of an apartment in the Stonecreek Apartments, across the street from the Pheasant Pointe Apartments. One of the occupants of the apartment, Steve Baker, came out of his bedroom to investigate the noise and was confronted by Adams, who said: "Where's the money?" Adams threatened to kill Baker if Baker called 911. Baker said he had no money, so Adams slapped him on the chest several times and again demanded to know where was the money. Lewis entered the apartment and grabbed a VCR, which Adams pointed out to him. Adams took a watch, cellular phone, wallet, and keys that were on top of a piano, and both Adams and Lewis left the apartment. Adams returned to the apartment the next day and tried to gain access using the keys he had taken but was scared off by Alan Sheridan, another resident of the apartment. Adams and Lewis later bragged and laughed about the robbery.

*Murder of Jean Suter*

At about 9:20 p.m. on August 6, 1998, the power went off in the Pheasant Pointe Apartments and the Stonecreek Apartments across the street. Adams, Lewis, and Hall were together in the Pheasant Pointe Apartments. They huddled together and whispered to each other, then borrowed a flashlight and went across the street to the Stonecreek Apartments.

Dennis Sawyer, a security guard on duty in the Stonecreek Apartments, encountered 80-year-old Jean Suter, a Stonecreek tenant, on a walkway. She did not have her purse. They briefly discussed the power outage, after which Suter headed off in the direction of her apartment. After Suter left, Sawyer saw Adams approach carrying what was later identified as Suter's purse.

About five minutes later, Lewis stood on a garbage can and jumped over a fence surrounding the pool area. On the ground in the pool area, he left the flashlight the men had borrowed. After

---

[1]  The following factual and procedural summaries are drawn from the January 8, 2002 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 2-7, filed in this court on January 21, 2004, as Exhibit D to respondent's answer.

2

jumping over the fence, he shouted: "Damn you, Jovan." He encountered Norma Stang, another Stonecreek tenant, and said, "Out of my way, bitch." He bumped into her as he headed out of the apartment complex.

Sawyer, having heard the commotion caused by Lewis's use of the garbage can, went to the pool area and spoke to Stang. She pointed out the flashlight. On his way around to get inside the pool area to retrieve the flashlight, Sawyer found Suter lying on the ground directly in front of her apartment. She was trying to get up but could not. Asked what had happened, she replied that she did not know what had happened or where she was. Sawyer told her she was in front of her own apartment. The door was wide open. He helped her to her feet and into the apartment. By the light of the flashlight he was carrying, Sawyer did not notice any injuries on Suter. To him, she did not seem to be in pain or to have difficulty breathing.

Adams and Lewis returned to the Pheasant Point Apartments with Suter's purse, which contained her cellular phone and credit cards. Calls were made on Suter's cellular phone that evening and the next day to Adams's girlfriend, Adams's uncle, Hall's cousin, and a friend of both Hall and Adams.

Adams and Lewis went with a friend to get marijuana. While in the car, Lewis chided Adams, saying: "I should kick your ass for leaving me." And later: "I had to hit this mother fucker upside the head." Adams grinned, but seemed to be afraid of Lewis.

The next day, on August 7, 1998, Suter was found in her bed in a coma and near death. She had injuries from four separate blunt force blows. Two blows to the head causing bruising, swelling, and a subdural hematoma. Two blows to the body caused bruising, swelling, a broken clavicle, a broken rib, and a punctured lung. These forceful blows could have been inflicted by the flashlight Adams and Lewis took to the apartments. An investigation revealed vomit on the floor in front of the chair where Sawyer left Suter, in the bathroom sink, and in the toilet bowl. Suter was taken to the hospital and put on life support.

The screen from the window to Suter's bedroom was lying on the ground and there were shoe prints on the window sill that were consistent with some of the shoes later seized from Adams and Lewis. Suter's purse and a jewelry box from her bedroom were missing. Several drawers of the dresser and filing cabinet were open.

Also on August 7, 1998, Adams went to Arden Fair Mall with Suter's credit cards and cellular phone. He and a friend used the cards to make purchases. When Lewis heard about Suter's death

from a television report, he caught a bus to Colorado, where he had a job offer.

When it became clear, on August 8, 1998, that further treatment would be futile, Suter was taken off life support, and she died.  An expert opined that Suter could have sustained her injuries before Sawyer found her outside her apartment.  The brain injury would have caused her slowly to deteriorate but was still consistent with moments of lucidity during which she encountered Sawyer, went into the bathroom, and got into bed.

Adams was arrested on August 8, 1998.  He admitted going to the Stonecreek Apartments during the power outage to commit a burglary.  He stated that he entered Suter's apartment through the front door and took her purse.  He saw Suter as he was leaving the area.  Lewis was arrested in Colorado on August 21, 1998.  He also admitted involvement in the burglary during the power outage.  He entered the apartment through the window, stole the jewelry box, and exited through the front door.  He claimed he bumped into an elderly woman and she spun around but did not fall down.  He jumped over the pool fence and lost the flashlight he was carrying.

## II.    Procedural Background

Adams and Lewis were charged and convicted by jury of robbery of Steve Baker, residential burglary, and first degree murder of Jean Suter.  The jury also found true the special circumstance that the murder was committed during the commission of burglary.  Hall was also charged with residential burglary and first degree murder but was acquitted of the charges.  Adams and Lewis were each sentenced to life without possibility of parole for first degree murder with the sentence for burglary stayed, plus four years for robbery.

Petitioner filed a timely appeal of his conviction in the California Court of Appeal.  Answer, Ex. A.  The Court of Appeal affirmed petitioner's conviction in its entirety.  Answer, Ex. D.  Petitioner subsequently filed a petition for review in the California Supreme Court.  Answer, Ex. E.  That petition was summarily denied by order dated March 20, 2002.  Answer, Ex. F.

////

////

////

4

**III.     Analysis**

   **A.  Standards for a Writ of Habeas Corpus**

   Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

>    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

   Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents "if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at a different result. *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000)).

   Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

   The court looks to the last reasoned state court decision as the basis for the state court judgment. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court reaches a

decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d).  *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

### B.  Petitioner's Claims

#### 1.  <u>Jury Instruction Error</u>

Petitioner raises a claim of jury instruction error.  He claims that the trial court's instruction to the jury regarding the "escape rule" for burglary rather than an instruction on "one continuous transaction" violated his due process rights.

#### a.  <u>Legal Standards</u>

A challenge to jury instructions does not generally state a federal constitutional claim. *Engle v. Isaac*, 456 U.S. 107, 119 (1982); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983).  However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process."  *Hines v. Enomoto*, 658 F.2d 667, 672 (9th Cir. 1981), *abrogated on other grounds* by *Ross v. Oklahoma*, 487 U.S. 81 (1988) (citing *Quigg v. Crist*, 616 F.2d 1107 (9th Cir. 1980));  *See also Prantil v. California*, 843 F.2d 314, 317 (9th Cir. 1988)  The analysis for determining whether a trial is "so infected with unfairness" as to rise to the level of a due process violation is similar to the analysis used in determining, under *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), whether an error had "a substantial and injurious effect" on the outcome.  *See Polk v. Sandoval*, 503 F.3d 903, 911 (9th Cir. 2007) (standard applied to habeas petition presenting a jury instruction challenge).

#### b.  <u>Jury Instruction on Burglary</u>

Petitioner claims that his right to due process was violated when "the trial court erroneously instructed that a burglary did not end until all perpetrators reached a place of temporary safety, in violation of the felony-murder 'one continuous transaction' test, and failed

6

1  to instruct on the 'one continuous transaction' test that governs killing in the commission of a

2  felony." Pet. at 27. As is apparent from the state court's discussion of this issue, petitioner's

3  claim presents essentially a question of state law. *See id.* at 27-33.

4      The California Court of Appeal explained the background to this claim and its disposition

5  as follows:

6          The felony-murder rule was enacted to protect the public, not to benefit criminals. (*People v. Chavez* (1951) 37 Cal.2d 656, 669-

7  670.) For the purpose of the felony-murder rule, a burglary committed by more than one person continues during the burglars'

8  escape until all burglars reach a place of temporary safety. (*People v. Bodely* (1995) 32 Cal.App.4th 311, 314 (hereafter *Bodely*);

9  *People v. Fuller* (1978) 86 Cal.App.3d 618 (hereafter *Fuller*), cited in *People v. Cooper* (1991) 53 Cal.3d 1158, 1169.) This rule

10  concerning the duration of a burglary is referred to as the "escape rule." "'[T]he escape rule serves the legitimate public policy

11  considerations of deterrence and culpability' by extending felony-murder liability beyond the technical completion of the crime.

12  [Citation.]" (*Bodely*, *supra*, at pp. 313-314.)

13          Consistent with *Bodely* and *Fuller*, the jury was instructed as follows: "For the purpose of determining whether an unlawful

14  killing has occurred during the commission or attempted commission of burglary, the commission of the crime of burglary

15  is not confined to a fixed place or a limited period of time. [¶] A burglary is in progress after the original entry while the perpetrator

16  is fleeing in an attempt to escape. [¶] A burglary is complete when all perpetrators have reached a place of temporary safety. [¶]

17  If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of burglary,

18  all persons who either directly or indirectly or actively commit the act constituting that crime, or who with knowledge of the unlawful

19  purpose of the perpetrator of the crime, and with intent or purpose of committing, encouraging, or facilitating the commission of the

20  offense, aid, promote, encourage or instigate by act or advice its commission, are guilty of murder of the first degree, whether the

21  killing is intentional, unintentional, or accidental."

22          The defendants assert *Bodely* and *Fuller* were decided incorrectly because they did not properly take into account whether the

23  burglary and the killing were part of one continuous transaction. Therefore, they urge, the trial court erred in instructing pursuant to

24  *Bodely* and *Fuller*. We disagree.

25          "Under the felony-murder rule, 'the evidence must establish that the defendant harbored the felonious intent either prior to or during

26  the commission of the acts which resulted in the victim's death . . .

7

.'  [Citation.]  First degree felony murder does not require proof of a strict causal relation between the felony and the homicide, and the homicide is committed in the perpetration of the felony if the killing and the felony are parts of one continuous transaction." (*People v. Ainsworth* (1988) 45 Cal.3d 984, 1016.)  The *Bodely* court relied on the "one continuous transaction" test when it approved the "escape rule."  It noted:  "Since the application of the escape rule to burglary is consistent with the 'one continuous transaction' rest, we conclude that felony-murder liability continues during the escape of a burglar from the scene of the burglary until the burglar reaches a place of temporary safety." (32 Cal.App.4th at p. 314.)

In *People v. Eaker* (1980) 100 Cal.App.3d 1007, the court approved an instruction imposing felony-murder liability if the burglary and homicide were part of one continuous transaction. The court held:  "If the homicide was committed during an escape from the burglary, it was a part of one continuous transaction; therefore, the court properly instructed the jury.  (*Id.* at pp. 1011-1012.)

The defendants assert the holding in *Eaker* required a "one continuous transaction" instruction in this case, instead of an "escape rule" instruction.  "Otherwise," the defendants contend, "a burglar who has departed the burglarized structure and is in the process of escape could be held liable for a separate and independent killing committed by a co-burglar that was entirely unrelated to the burglary and/or be held liable for a killing that occurred during a <u>new</u> burglary that was not the natural consequence of the first burglary."  (Underlining in original.)  This reasoning fails.

As held by the Supreme Court in *Ainsworth*, "felony murder does not require proof of a strict causal relation between the felony and the homicide . . . ." (45 Cal.3d at p. 1016.)  The defendants' reasoning, however, seeks to impose a causal relation test.  The felony-murder rule imposes liability on escaping burglars as a matter of public policy.  (*People v. Bodely, supra,* at pp. 313-314.)  Furthermore, the defendants' apparent concern that they might be held liable for an unrelated murder is unfounded because the jury was instructed that, to find the defendants guilty of felony murder, it had to find the killing occurred "during the commission or attempted commission of burglary . . . ."  If the defendants wanted further clarification in this regard, they had the responsibility to request it.  (*People v. Alvarez* (1996) 14 Cal.4th 155, 222-223.) The trial court did not err in instructing the jury using the escape rule.

Opinion at 7-10.

////

8

1    This state law question of whether the trial court violated California caselaw when it gave

2    an "escape rule" jury instruction, as opposed to an instruction on "one continuous transaction," is

3    not cognizable in this federal habeas corpus proceeding.  *See Jammal v. Van de Kamp*, 926 F.2d

4    918, 919 (9th Cir. 1991) ("the issue for us, always, is whether the state proceedings satisfied due

5    process; the presence or absence of a state law violation is largely beside the point").  The only

6    question before this court is whether the state court's decision rejecting petitioner's jury

7    instruction claim is contrary to or an unreasonable application of the federal due process

8    principles set forth above.  28 U.S.C. § 2254(d).  In order to answer this question, the court must

9    determine whether the trial court's failure to give a jury instruction on "one continuous

10   transaction" rendered petitioner's trial fundamentally unfair.

11   Under the circumstances of this case, petitioner's trial was not rendered fundamentally

12   unfair as a result of the jury being instructed on the "escape rule" and not on the "continuous

13   transaction" rule.  All of the evidence in this case reflected that the murder of Suter was

14   committed in connection with the burglary of her home or, put another way, was part of the

15   "continuous transaction" constituting that burglary.  Specifically, the evidence indicated that

16   Suter's killing was committed by petitioner or his co-defendant during the escape from Suter's

17   home after the burglary.  There is no evidence that the homicide was unrelated to the burglary of

18   Suter's residence or that the murder occurred during a "new" burglary, as petitioner argues.  For

19   these reasons, petitioner did not suffer prejudice in this case due to the trial court's failure to

20   specifically inform the jury that petitioner could not be found guilty of felony-murder if the

21   killing was separate from the burglary.  Further, as noted by the California Court of Appeal,

22   petitioner's jury was instructed that, in order to find petitioner guilty of felony-murder, they had

23   to find that the killing occurred during the commission or attempted commission of the burglary

24   of Suter's home.  This instruction would preclude the jury from finding petitioner guilty of

25   felony-murder based on a killing unrelated to the burglary.

26   ////

1    Petitioner has not cited any United States Supreme Court case holding that, for purposes

2    of due process and the felony-murder rule, a jury instruction must inform the jury that a

3    homicide is committed in the perpetration of a felony only if the killing and the felony are part of

4    one continuous transaction.  *See Stevenson v. Lewis*, 384 F.3d 1069, 1071 (9th Cir. 2004) (state

5    court's decision not contrary to federal law where no United States Supreme Court precedent

6    exists).  Accordingly, petitioner has failed to demonstrate that the decision of the California

7    Court of Appeal is contrary to or an unreasonable application of United States Supreme Court

8    authority.

9    For all of these reasons, petitioner is not entitled to relief on this claim.

10    **c.  Special Circumstance Instructions**

11    Petitioner's next claim is that the jury instruction on the burglary special circumstance

12    was contrary to federal law and rendered his trial fundamentally unfair.  He also claims that the

13    prejudicial effect of the instruction was exacerbated by the prosecutor's closing argument.  Pet.

14    at 33.  The California Court of Appeal rejected this argument with the following reasoning:

15    In *Tison v. Arizona* (1987) 481 U.S. 137 [95 L.Ed.2d 127], the
      United States Supreme Court concluded the Eighth Amendment
16    does not prohibit the death penalty for a felony murderer who was
      not the actual killer and who did not intend to kill, but, rather, was
17    a major participant in the underlying felony who harbored a mental
      state of "'reckless indifference to . . . human life.'"  (481 U.S. at
18    pp. 152, 158.)  *Tison* defined "major participant" as a defendant
      who is actively involved in every element of the underlying felony
19    and is physically present during the entire sequence of criminal
      activity culminating in the murder.  (*Id.* at p. 158.)  *Tison* defined
20    "reckless indifference to human life" as a subjective appreciation,
      or knowledge, by the defendant that his acts are likely to result in
21    the taking of innocent life.  (*Id.* at pp. 152, 157-158.)

22    After *Tison*, the Legislature amended Penal Code section 190.2 to
      add the language from *Tison* concerning special circumstance
23    liability for a co-perpetrator who was not the actual killer.  The
      California Supreme Court, in *Tapia v. Superior Court* (1991) 53
24    Cal.3d 282, noted that section 190.1, subdivision (d), "brings state
      law into conformity with *Tison* . . . ."  (53 Cal.3d at p. 298, fn. 16.)

25
      Consistent with Penal Code section 190.2, the trial court instructed
26    the jury using CALJIC No. 8.80.1, as follows:

10

"The People have the burden of proving the truth of the special circumstance.  [¶]  If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true.  [¶]  If you find that a defendant was not the actual killer of a human being, or if you are unable to decide whether the Defendant was the actual killer or an aider and abettor, you cannot find the special circumstance to be true as to that Defendant unless you are satisfied beyond a reasonable doubt that such Defendant, with reckless indifference to human life, and as a major participant aided and abetted in the commission of the crime of burglary which resulted in the death of a human being namely, Jean Suter.  [¶]  A Defendant acts with reckless indifference to human life when that Defendant knows or is aware that his acts involve a grave risk of death to an innocent human being."

On appeal, the defendants argue that the instruction was insufficient because, even though it informed the jury that a co-perpetrator who was not the actual killer could not be held responsible for felony murder unless he acted with reckless indifference to human life, the instruction did not prohibit the jury from finding that a defendant acted with reckless indifference to human life based solely on the fact that the defendant participated in the burglary, the underlying felony.  They argue the instruction did not prevent "the jury from making its 'reckless indifference' finding in the <u>abstract</u> based on felony murder simpliciter,[2] i.e., defendant's knowing participation in a felony that resulted in death and constituted first degree felony-murder." [Underlining in original]  They contend that a trial court must instruct "that participation in an underlying felony that results in a felony-murder death is insufficient for a 'reckless indifference' finding and that the <u>actual</u> circumstances of the criminal activity must, as a natural consequence, carry a grave risk of death." [Underlining in original].  We conclude that the instruction properly conveyed the requirement in *Tison* and Penal Code section 190.2, subdivision (d) that the non-killer acted with reckless indifference to human life.

Contrary to the defendants' argument, the instruction, as given, required the jury to determine a non-killer's mental state – that is, whether he acted with reckless indifference to human life.  In so instructing, the court did not allow the jury, either expressly or by implication, to forego its duty of determining the non-killer's mental state by presuming the non-killer harbored the required mental state simply because he engaged in burglary.  The jury was instructed to determine whether the non-killer acted with reckless indifference to human life, and we presume the jury followed this instruction.  (*See People v. Harris* (1994) 9 Cal.4th 407, 425-426.)

---

[2]  "Simpliciter" in this context means "taken alone."  (Garner, Dict. of Modern Legal Usage (2d ed. 1995) p. 809.)

The defendants further argue that the prosecutor led the jury to believe it could find the non-killer acted with reckless indifference to human life simply because he participated in a burglary.  This argument is not supported by the record.

During closing argument, the prosecutor made the following statements concerning a finding of reckless indifference to human life:

"Reckless indifference to human life means that the defendant knows or is aware that his acts involve a grave risk of death to an innocent human being.  [¶]  How do we know that occurred in this case?  It's [a] pretty simple concept, policy behind this.  That is your home is your castle.  [¶]  You enter someone's home.  Either the person who owns the home could be hurt perhaps while someone is fleeing, perhaps [because] they're surprised, the perpetrator, and a fight breaks out.  [¶]  Perhaps because the person inside has a heart attack, or it could be because that person inside has a weapon, that is the homeowner, and shoots the person or stabs or commits some other sort of attack on the person entering their home.  [¶]  So reckless indifference to human life means you know when you go in there that somebody, and it might be the worst case scenario, but nonetheless if you enter that home somebody could get hurt and die.  [¶]  Jovan Hall was on the stand.  He knows, he knows this.  He told you in fact that that was one of the reasons in his lecture to [Adams] for not going in the burglary at all.  [¶]  He was saying, well, one, it's trespass, and two, someone could be inside, and somebody might get hurt or injured.  That was his reasoning for telling [Adams] not to go in there in the first place.  [¶]  If Mr. Hall knows that, I think it's clear that Mr. Adams knows that and Mr. Lewis knows that.  It's reckless.  [¶]  You go into somebody's house at night, all the lights are out.  That is a reckless indifference to human life.  [¶]  It's completely reckless to enter someone's house.  You don't know if you're gonna get shot or somebody's in there.  [¶]  They knocked on the door.  They took some precautions, but they entered the house.  But while they're fleeing even, trying to get away, somebody can get injured.  That's a special allegation here."

While the prosecutor discussed the elements of burglary, he tied those elements to the actual circumstances of this case.  He also discussed facts that were not elements of the burglary but revealed the non-killer's state of mind.  For example, the plan was undertaken at night, with knowledge that someone could discover them, despite their apparent precautions to avoid detection.[3]  Neither the instructions nor the prosecutor's argument misrepresented the requirements of *Tison* and Penal Code section

---

[3]  In any event, the trial court instructed the jury to disregard the statements of the prosecutor to the extent they conflicted with the law as given by the court.

1       190.2, subdivision (d).  Accordingly, we conclude the trial court
         did not err.
2

3    Opinion at 10-15.

4           *Tison* considered the role that a defendant's intent should play in an Eighth Amendment

5    determination of whether the death penalty is an excessive punishment for a particular defendant.

6    Specifically, *Tison* held that a reckless disregard for someone's life, combined with an intent to

7    engage in conduct that endangers that person's life and ultimately results in his death, is

8    sufficient to permit a sentence of death.  Pursuant to Cal. Penal Code § 190.2, a criminal

9    defendant in California can receive a sentence of death or life without the possibility of parole if,

10   among other things, a murder was committed while the defendant was engaged in a first or

11   second degree burglary or the immediate flight therefrom.  Cal. Penal Code § 190.2 (17).  A

12   person who is not the killer may receive such a sentence if he commits a first or second degree

13   burglary "with reckless indifference to human life."  Cal. Penal Code § 190.2 (d).

14          The trial judge's instruction in this case regarding the circumstances under which

15   petitioner could receive a sentence of life without the possibility of parole, which was modeled

16   after the requirements of *Tison*, was not incorrect and did not violated petitioner's right to a fair

17   trial.  As explained by the California Court of Appeal, the instruction required the jury to find

18   that petitioner acted with "reckless indifference to human life" when he engaged in the actions

19   leading to Suter's death, defined as a knowledge that his acts involved a grave risk of death to an

20   innocent human being.  In his closing argument, the prosecutor specifically noted that the

21   circumstances of the burglary in this case carried a high risk of injury or death.  Under these

22   circumstances, there is no likelihood the jury believed that the fact that a burglary was

23   committed, standing alone, was sufficient for a finding of "reckless indifference to human life."

24   On the contrary, by virtue of the special circumstance jury instruction and the prosecutor's

25   closing argument, petitioner's jury was informed that the actual circumstances of the burglary

26   had to carry a grave risk of injury or death to justify a sentence of life without the possibility of

13

1   parole.  This was sufficient to satisfy the requirements of *Tison* and the due process clause.

2   Accordingly, petitioner is not entitled to relief on this claim.

3   ## 2. Sufficiency of the Evidence

4        Petitioner's next claim is that the finding as "true" the felony-murder special

5   circumstance allegation should be set aside because there was insufficient evidence he

6   committed the burglary of Suter's apartment with reckless indifference to human life.  Pet. at 41.

7   In support of this argument, petitioner notes that the identity of Suter's killer was never

8   conclusively established and that there was evidence he and Adams did not enter the apartment

9   until they had established that it was vacant.  *Id.* at 42.  He also notes that neither he nor Adams

10  armed themselves with "a deadly weapon, i.e., a gun or knife."  *Id.*

11       The California Court of Appeal rejected this claim on the ground that the jury was not

12  required to make a finding of reckless indifference to human life before finding the special

13  circumstance true because there was sufficient evidence that petitioner himself was the killer.

14  The court reasoned as follows:

15            Both defendants assert the evidence was insufficient to establish
             they acted with reckless indifference to human life and, therefore,
16           the special circumstance finding must be reversed.  We must
             consider this argument separately as to each defendant because,
17           while there was sufficient evidence Lewis was the actual killer,
             there was no evidence Adams was the actual killer.

18

19           As Lewis acknowledges, the requirement of finding reckless
             indifference to human life before finding true a burglary special
20           circumstance does not apply if there was sufficient evidence for
             the jury to conclude that the defendant was the actual killer.  (See
21           Pen. Code, § 190.2 [requiring reckless indifference only if
             defendant not actual killer]; see also *People v. Smithey* (1999) 20
22           Cal.4th 936, 1016 [same].)  Since we conclude there was sufficient
             evidence for the jury to conclude that Lewis was the actual killer,
23           we need not consider his reckless indifference argument.

24           Lewis admittedly encountered Suter as he was exiting the
             apartment.  He asserted he merely bumped her, but the evidence,
25           including his proximity to her, her injuries, and the likelihood that
             the injuries were caused by the flashlight he was carrying, support
26           the inference he beat her, striking her at least four times with
             considerable force.  Additionally, he criticized Adams for leaving

14

1    him at the apartment and stated he had hit Suter "upside the head."

2    Opinion at 18-19.  The question before this court is whether the state court's conclusion that

3    sufficient evidence supported a finding that petitioner killed Suter is contrary to or an

4    unreasonable application of United States Supreme Court law.

5         There is sufficient evidence to support a conviction if, "after viewing the evidence in the

6    light most favorable to the prosecution, any rational trier of fact could have found the essential

7    elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319

8    (1979); *see also Juan H. v. Allen*, 408 F.3d 1262, 1274, 1275 & n.13 (9th Cir. 2005).  Viewing

9    the evidence in the light most favorable to the verdict, and for the reasons expressed by the state

10   appellate court, there was sufficient evidence from which a reasonable trier of fact could have

11   found beyond a reasonable doubt that petitioner fatally injured Suter with his flashlight when he

12   encountered her after he burgled her apartment.  Accordingly, the conclusion of the state court

13   that sufficient evidence supported the jury's true finding on the burglary special circumstance is

14   not contrary to federal law and may not be set aside.

15        Even if a finding of reckless indifference was required in order to support petitioner's

16   sentence of life without the possibility of parole, this court concludes that the evidence was

17   sufficient for such a finding.  As stated by the California Court of Appeal in connection with its

18   decision on this claim regarding petitioner's co-defendant Adams:

19            Adams went to the Stonecreek Apartments intending to commit a
             burglary.  Just days earlier, he had committed a violent entry into
20           an apartment, assaulting the occupant and demanding money.  This
             time, he went with intent to commit a crime in the dark.  He claims
21           he made sure there was no one inside before entering; however, the
             jury was not bound by his claim.  Indeed, a burglar can never be
22           certain no one is in a home into which he enters.  Here, there was
             evidence entry was made through the window and the apartment,
23           fortuitously being temporarily empty, was searched for valuables.
             Adams knew the occupant could return at any time.  His history
24           shows he was willing to use force to complete his crimes.
             Committing the crime in concert with Lewis made it easier to use
25           violence to accomplish their goal by overpowering the occupant.

26   ////

15

> Residential burglary, especially under the specific circumstances
> of this case, including a nighttime entry during a power outage,
> poses a serious risk to innocent human beings. (citation omitted.)
> In the dark, a victim is more likely to happen upon the criminal
> unexpectedly, exactly as happened here.  Furthermore, violence is
> more likely to take place with the combination of surprise and
> close proximity.  This violence, intensified by the criminal's desire
> to complete the crime and escape and by the victim's natural
> impulse to protect life, limb, and abode, poses a grave risk of death
> to an innocent human being.  Adams's was not a harmless prank
> gone awry; it was an inherently and specifically dangerous crime
> exhibiting reckless indifference to human life.  The evidence was
> sufficient to sustain the special circumstance finding.

Opinion at 19-20.  These arguments are equally applicable to petitioner's actions on the night of

the killing.

   In sum, the evidence in this case was sufficient to support the jury's true finding on the

special circumstance allegation.  Accordingly, petitioner is not entitled to relief on this claim.

### 3. Prosecutor's Use of Peremptory Challenges

   Petitioner, who is African-American, claims that his conviction must be reversed because

the prosecutor exercised peremptory challenges to strike two black female jurors on the basis of

race, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).

### a. Background

   The state court record reflects that there were four African-American prospective jurors

in the pool of 100 persons summoned for petitioner's trial.  Augmented Reporter's Transcript on

Appeal (ART) at 7-15, 143.  The prosecution and defense each had thirty-five peremptory

challenges that they could exercise, plus several more for alternate jurors.  *Id.* at 5.  At the

beginning of voir dire, the trial court randomly called 18 of the 100 jurors into the jury box for

voir dire.  *Id.* at 15.  Of these 18 jurors, only Sallie T. was African-American.  *Id.* at 7-15, 143.

During voir dire, the following colloquy occurred between the trial judge and Sallie T:

> Q.  Okay.  Have we covered everybody's relatives or friends or
> someone very close to you who has been in trouble with the law in
> this area?
>
> Yes, Ms. T[]?

1       A.  Oh, I have numerous people in jail in my family.

2       Q.  In jail?

3       A.  For armed robbery, muggings.

4       Q.  Okay.  These are people, brothers?

5       A.  Cousins.

6       Q.  Cousins?

7       A.  Cousin, yeah.

8       Q.  Let me ask you, Ms. T[].  This is all in the Sacramento County
9       area?

       A.  Yes.
10

11      Q.  And was there ever any feeling that you had during these
circumstances, that your cousins or family members were being
unfairly treated by the authorities in any way?
12

13      A.  No.

14      Q.  And do you think because your family members have been in
trouble with the law, that it's going to affect your ability to be fair
in this case in any way?
15

16      A.  No.

17  *Id.* at 30-31.

18       The prosecutor used his third peremptory challenge to exclude Sallie T from the jury.  *Id.*

19  at 92-93.  At this point, defense counsel made a joint challenge to the prosecutor's challenge to

20  Sallie T. pursuant to *People v. Wheeler*, 22 Cal.3d 258 (1978).[4]  *Id.* at 93, 104.  The trial court

21  denied the challenge, ruling as follows:

22  ////

23

24      [4]  In *Wheeler*, the California Supreme Court held that peremptory challenges may not be
used to exclude from a jury all or most members of a cognizable group solely on the ground of
presumed "group bias."  *Wheeler* is "the California counterpart to *Batson*."  *Yee v. Duncan*, 463
25  F.3d 893, 896 (9th Cir. 2006).  Although petitioner made his motion pursuant to *Wheeler*, the
standards set forth in *Batson* control this court's disposition of this case.  *Kesser v. Cambra*, 465
26  F.3d 351, 353 (9th Cir. 2006); *Lewis v. Lewis*, 321 F.3d 824, 827 & n. 5 (9th Cir. 2003).

> THE COURT:  All right.  On the record outside the presence of the jury.  Mr. Holmes, you wanted to put on the record –
>
> MR. HOLMES (counsel for petitioner's co-defendant Adams): Yes, Your Honor, the prosecution excused a Ms. T[], I forgot what seat she's in, I think seat –
>
> THE COURT:  Seven or eight.
>
> MR. HOLMES:  – Eight, and we would like to lodge a *Wheeler* objection on that at this time.
>
> THE COURT:  The Court heard the objection at side bar, is satisfied a prima facie case has not been made, so I will deny the motion at this time.

*Id.* at 104.[5]

Veronica M. was the second black prospective juror to be called into the jury box for voir dire.  *Id.* at 97, 143.  During voir dire, Veronica M. stated that her brother worked for the Department of Corrections, she had lived in Sacramento for "20 plus years," she was employed with the California Department of Disability Adult Program Services, and she thought she could be a fair juror.  *Id.* at 97, 101.  The prosecution used its eleventh peremptory challenge to remove Veronica M.  *Id.* at 93, 118.  At that point, the defense made another *Wheeler* challenge.  *Id.* at 118.[6]  Outside the presence of the jury, the following discussion occurred relative to that challenge:

> THE COURT:  All right.  And then with the challenge to Ms. M[], juror number ten, and the previous challenge to Ms. T[], juror number eight, both of whom were black, the Court has entertained at side bar a *Wheeler* motion by the defense, joined in by all sides. The Court is still not satisfied based upon its determinations here of the questionnaires and the like that there have been a *Wheeler* violation or a prima facie case shown at this time.

---

[5]  The record reflects that immediately after the prosecutor excused Sallie T., all defense counsel asked permission to approach the bench, at which time an unreported discussion occurred.  *Id.* at 93.  The *Wheeler* objection was apparently discussed during that unreported sidebar conference.

[6]  This second *Wheeler* challenge was also discussed during an unreported sidebar conference.  *Id.*

1      So I'm going to not require the district attorney to state his
        reasons.

2      MR. PETERS:  Your Honor, could I be heard on that?

3      THE COURT:  You certainly may, Mr. Peters.

4      MR. PETERS:  Your Honor, I'd like to state that I believe we had
        a hundred people on the panel.  I think there were four Blacks to
5      start.  I'm not positive, but that's what I counted.

6      THE COURT:  That's what I counted.

7      MR. PETERS:  And he has excused two of the four.  And whether
        or not the other ones will come up, I don't know, because of the
8      amount of challenges that we've had to use here, the defense
        challenges.  So, I mean, Miss Wilson has advised me that we've
9      used our 20.

10     THE COURT:  I have you having used 20, right.

11
        MR. PETERS:  So it seems to me that I think some showing
12     should be required of Mr. Sawtelle at this point because of the fact
        that there's such a low number of Blacks on the panel that we
13     have, and he has excused two of them so far.

14     And I think one of them, that last one had a good friend in the
        CDC or something as I recall, but I just wanted to state that.
15
        THE COURT:  I don't think that was his reason.
16
        MR. PETERS:  I don't know what his reason was.
17
        THE COURT:  Well, looking at the questionnaire I can discern
18     one.

19     MR. MASUDA (counsel for co-defendant Hall):  Well, your
        Honor –
20
        THE COURT:  I'm not sure whether I should state that for the
21     record what I discern.

22     MR. MASUDA:  What I saw –

23     THE COURT:  I think you have to have a prima facie case of bias
        before I require him to enunciate his, and I don't think I have to
24     enunciate it for him.

25     MR. MASUDA:  Well, all I'm saying with respect to the
        questionnaire, I saw on there where she had sat on previous jury
26     duty, and the indication was that they did not reach a verdict.

                                    19

1        THE COURT:  Right.

2        MR. MASUDA:  But that's also true with Mr. Medina who the
         district attorney did pass on.
3
         THE COURT:  I'm not sure what his ultimate choice was.
4
         MR. MASUDA:  That's the only thing I could see on the
5        questionnaire where I would think the person would knock off –

6        THE COURT:  Mr. Medina was a minority as well, but Hispanic.

7        MR. MASUDA:  But Hispanic, I think a big difference here since
         we have three young Black men.  But I know he did pass on the
8        panel when Mr. Medina was in the, was in the box.

9        And Mr. Medina has a questionnaire filled out that he sat on a
         criminal case in 1990 or '88, and they were not able to reach a
10       verdict.

11       So I think that in itself with the questionnaire, and the fact that two
         out of the three [sic] prospective jurors, Black jurors have been
12       excused by district attorney would be a sufficient showing.

13       THE COURT:  I'm going to deny the motion at this time.

14   *Id.* at 142-45.

15                    **b.  State Court Decision**

16       On direct appeal, petitioner argued that his constitutional rights were violated by the

17   prosecutor's improper use of peremptory challenges to exclude Sallie T. and Veronica M. from

18   the jury.  The California Court of Appeal denied this claim with the following reasoning:

19       Lewis and Adams are African-American, as were four of the 100
         prospective jurors in the jury panel.  During the jury selection
20       process, the prosecution used two of its peremptory challenges to
         excuse two African-American women.  The defendants objected
21       each time, based on *People v. Wheeler*, (1978) 22 Cal.3d 258.  The
         trial court, however, found there was no prima facie showing of
22       group bias and overruled the defendants' objections without
         requiring the prosecutor to state reasons for exercising the
23       peremptory challenges.[7]

24   ////

25   _____

26       [7]  The record does not reflect whether the two remaining African-American prospective
     jurors eventually served on the jury.

The defendants assert the trial court erred in finding they had not made a prima facie showing that the prosecution violated their constitutional rights under *People v. Wheeler, supra*, 22 Cal.3d 258 and *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69]. They contend the trial court applied the wrong legal standard in determining whether a prima facie showing had been made and improperly found such showing had not been made.  These contentions are without merit.

"'It is well settled that the use of peremptory challenges to remove prospective jurors solely on the basis of a presumed group bias based on membership in a racial group violates both the state and federal Constitution.'  [Citations.]  Under *Wheeler* and *Batson*, '"[i]f a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court.  First, . . . he should make as complete a record of the circumstances as is feasible.  Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule.  Third, from all the circumstances of the case he must show a strong likelihood [or reasonable inference] that such persons are being challenged because of their group association . . . ."'  [Citations.]"  (*People v. Box* (2000) 23 Cal.4th 1153, 1187-1188.)

The California Supreme Court has declared, in *People v. Box, supra,* 23 Cal.4th at pg. 1188, footnote 7, that, in order to determine whether there is a prima facie showing of group bias under *People v. Wheeler, supra*, 22 Cal.3d 258, the court must determine whether a *reasonable inference* arises that peremptory challenges are being used on the ground of group bias.  This declaration resolved a split in Court of Appeal decisions.  In *People v. Fuller* (1982) 136 Cal.App.3d 403, Division One of the Fourth Appellate District, presaging *Box*, decided that the proper standard was whether there arose a *reasonable inference* of group bias.  In *People v. Bernard* (1994) 27 Cal.App.4th 458, however, Division One of the Fourth Appellate District disagreed with *Fuller* and held that the proper standard was whether a *strong likelihood of group bias* had been shown.

There is no indication in the record concerning which standard the trial court used in concluding there was no prima facie showing of group bias.  Because *Box* was decided after the trial in this case, the defendants assert the trial court was bound, under stare decisis, by *Bernard* and therefore applied the improper standard.  To the contrary, stare decisis did not bind the trial court to apply the improper *Bernard* standard.  When opinions of the Court of Appeal conflict, the trial court must apply its own wisdom to the matter and choose between the opinions.  (*McCallum v. McCallum* (1987) 190 Cal.App.3d 308, 315, fn. 4.)  "As a practical matter, a

21

superior court ordinarily will follow an appellate opinion emanating from its own district even though it is not bound to do so.  Superior courts in other appellate districts may pick and choose between conflicting lines of authority.  This dilemma will endure until the Supreme Court resolves the conflict, or the Legislature clears up the uncertainty by legislation."  (*Ibid.*)

Because the trial court was not bound by *Bernard* and there is no indication that the court applied the improper standard, we will not presume so.  Instead, we presume correctness.  (*See* Evid. Code, 664 [presuming official duty performed].)  An appellant bears the burden of affirmatively showing error on appeal.  (*See People v. Coley* (1997) 52 Cal.App.4th 964, 972.)  The defendants have not done so here.

The defendants also assert the trial court erred in finding that no reasonable inference of bias existed.  "'When a trial court denies a *Wheeler* motion because it finds no prima facie case of group bias was established, the reviewing court considers the entire record of voir dire.'  [Citation.]  'If the record "suggests grounds upon which the prosecutor might reasonably have challenged" the jurors in question, we affirm.'"  (*People v. Box, supra*, 23 Cal.4th at p. 1188.)  Contrary to the defendants' suggestion, the prosecutor had reasonable grounds to challenge the African-American prospective jurors.

During general questioning of the prospective jurors concerning whether a family member had been charged with a crime, Sallie T., one of the African-American prospective jurors, responded:  "Oh, I have numerous people in jail in my family."  She further explained her cousins were incarcerated for armed robbery and muggings in Sacramento County.  While she asserted she would not be biased as a result of her family situation, the fact she had family members incarcerated for crimes in Sacramento County was a ground for a reasonable challenge by the prosecutor because it was evidence that she could be biased against the prosecution.  (*See People v. Douglas* (1995) 36 Cal.App.4th 1681, 1689 [finding reasonable use of peremptory challenge when family members of prospective juror had criminal records].)

Veronica M., another African-American prospective juror, had previously served on a jury that did not reach a verdict.  She was a long-time Sacramento resident, who works for the state and has a brother who is an employee of the Department of Corrections.  She also felt she could be a fair juror; however, the prosecution was justified in challenging her because of the inference that she might have been the cause of the prior hung jury and could do the same in this trial.  (*See People v. Rodriguez*, (1999) 76 Cal.App.4th 1093, 1114 [finding reasonable use of peremptory challenge when prospective juror served on prior hung jury].)

Defendants protest that the prosecutor did not challenge another prospective juror who had previously been a juror in a case in which the jury did not reach a verdict. The *Box* court responded to a similar contention as follows: "Defendant argues, however, that these and the other bases stated by the prosecutor are insufficient because the prosecutor did not excuse other non-Black jurors who displayed similar characteristics. 'However, we have previously rejected a procedure that places an "undue emphasis on comparisons of the stated reasons for the challenged excusals with similar characteristics of nonmembers of the group who were not challenged by the prosecutor," noting that such a comparison is one-sided and that it is not realistic to expect a trial judge to make such detailed comparisons midtrial.' [Citations.] 'In addition, we have observed that "the same factors used in evaluating a juror may be given different weight depending on the number of peremptory challenges the lawyer has at the time of the exercise of the particular challenge."' [Citation.] 'Moreover, "the very dynamics of the jury selection process make it difficult, if not impossible, on a cold record, to evaluate or compare the peremptory challenge of one juror with the retention of another juror [who] on paper appears to be substantially similar."' [Citation.]" (*People v. Box, supra,* 23 Cal.4th at p. 1190.)

Additionally, the defendants claim the prosecutor's challenges were suspect because he exercised them against African-American *women*. The analysis is the same, however. There were grounds for a reasonable challenge.

The trial judge, having participated in the jury selection process, was in the best position to determine under all the relevant circumstances whether there was a reasonable inference the African-American prospective jurors were challenged because of their group association. (*See People v. Box, supra,* 23 Cal.4th at p. 1189.) Because there were grounds for reasonable challenges against the African-American prospective jurors, we conclude there was no error.

Opinion at 21-26.

### c. **Prior Proceedings in this Court**

By order dated November 4, 2008, this court determined that a de novo standard of review, and not the AEDPA deferential standard, must be employed when deciding petitioner's *Batson/Wheeler* claim. *See* November 4, 2008, Order at 10-13. The court also determined that petitioner had demonstrated a prima facie case under *Batson* with respect to the prosecutor's exercise of a peremptory challenge against jurors Sallie T. and Veronica M. such that the

1  challenge must be explained and the explanation evaluated for pretext.  *Id.* at 13-19.

2  Accordingly, an evidentiary hearing was held on February 2, 2009, to afford the prosecutor the

3  opportunity to explain his reasons for excluding Sallie T. and Veronica M. from petitioner's jury.

4  Subsequent to that evidentiary hearing, on February 26, 2009, petitioner filed an "Amended Post

5  Evidentiary Hearing Brief" (Petitioner's Brief), and Exhibits A, A-1, and B.  On March 10,

6  2009, respondent filed a "Post-Evidentiary Hearing Brief" (Respondent's Brief).  On March 16,

7  2009, petitioner filed a "Reply/Response to Respondent's Brief" (Petitioner's Reply), and

8  Exhibits A-D.  This court has considered those briefs and exhibits in issuing these findings and

9  recommendations.

10                **d.  Legal Standards Regarding Petitioner's Batson/Wheeler Claim**

11            Purposeful discrimination on the basis of race or gender in the exercise of peremptory

12  challenges violates the Equal Protection Clause of the United States Constitution.  *See Batson*,

13  476 U.S. at 79; *Johnson v. California*, 545 U.S. 162 (2005).  So-called *Batson* claims are

14  evaluated pursuant to a three-step test:

15                    First, the movant must make a prima facie showing that the
                    prosecution has engaged in the discriminary use of a peremptory
16                    challenge by demonstrating that the circumstances raise "an
                    inference that the prosecutor used [the challenge] to exclude
17                    veniremen from the petit jury on account of their race."  [Citation
                    omitted.]  Second, if the trial court determines a prima facie case
18                    has been established, the burden shifts to the prosecution to
                    articulate a [gender]-neutral explanation for challenging the juror
19                    in question.  [Citation omitted.]  Third, if the prosecution provides
                    such an explanation, the trial court must then rule whether the
20                    movant has carried his or her burden of proving the existence of
                    purposeful discrimination.
21

22  *Tolbert v. Page*, 182 F.3d 677, 680 (9th Cir. 1999) (en banc).

23            In order to establish a prima facie case of racial discrimination, petitioner must show that

24  "(1) the prospective juror is a member of a "cognizable racial group," (2) the prosecutor used a

25  peremptory strike to remove the juror, and (3) the totality of the circumstances raises an

26  inference that the strike was motived by race."  *Boyd v. Newland*, 467 F.3d 1139, 1143 (9th Cir.

2006) (citing *Batson*, 476 U.S. at 96 and *Cooperwood v. Cambra*, 245 F.3d 1042, 1045-46 (9th Cir. 2001)).  A prima facie case of discrimination "can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.'" *Johnson*, 545 U.S. at 169 (quoting *Batson*, 476 U.S. at 94.)  In evaluating whether a defendant has established a prima facie case, a reviewing court should consider the "'totality of the relevant facts' and 'all relevant circumstances' surrounding the peremptory strike." *Boyd*, 467 F.3d at 1146 (quoting *Batson*, 476 U.S. at 94, 96).  This should include a review of the entire transcript of jury voir dire in order to conduct a comparative analysis of the jurors who were stricken and the jurors who were allowed to remain.  *Boyd*, 467 F.3d at 1050 ("We believe, however, that Supreme Court precedent requires a comparative juror analysis even when the trial court has concluded that the defendant failed to make a prima facie case").  *See also Miller-El v. Dretke*, 545 U.S. 231 (2005) (utilizing comparative analysis, in a case in which a prima facie showing had been made, to determine whether the prosecutor had been motived by racial bias in exercising peremptory challenges).[8]

   At the second step of the *Batson* analysis, "'the issue is the facial validity of the prosecutor's explanation." *Hernandez v. New York*, 500 U.S. 352, 360 (1991).  "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror." *Id.* at 360.  "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." *Stubbs v. Gomez*, 189 F.3d 1099, 1105 (9th Cir. 1999) (quoting *Hernandez*, 500 U.S. at 360).  For purposes of step two, the prosecutor's explanation need not be "persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768 (1995).  Indeed, "to accept a prosecutor's stated nonracial reasons, the court

---

   [8]  Comparative juror analysis refers to "an examination of a prosecutor's questions to prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise similar jurors differently because of their membership in a particular group." *Boyd*, 467 F.3d at 1145.  *See also Miller-El*, 125 S.Ct. at 2325 (stating that "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve" was "more powerful" than bare statistics).

1   need not agree with them." *Kesser*, 465 F.3d at 351.  "It is not until the *third* step that the

2   persuasiveness of the justification becomes relevant--the step in which the trial court determines

3   whether the opponent of the strike has carried his burden of proving purposeful discrimination."

4   *Purkett*, 514 U.S. at 768 (emphasis in original).  The question is whether, after an evaluation of

5   the record pertaining to that particular case, the prosecutor's race-neutral explanation for a

6   peremptory challenge should be believed.  *Id.*

7        In the third step of a *Batson* challenge, the trial court has "the duty to determine whether

8   the defendant has established purposeful discrimination," *Batson*, 476 U.S. at 98, and, to that

9   end, must evaluate the "persuasiveness" of the prosecutor's proffered reasons.  *See Purkett*, 514

10  U.S. at 768.  In determining whether petitioner has carried this burden, the Supreme Court has

11  stated that "a court must undertake 'a sensitive inquiry into such circumstantial and direct

12  evidence of intent as may be available.'"  *Batson*, 476 U.S. at 93 (quoting *Arlington Heights v.*

13  *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)); *see also Hernandez*, 500 U.S. at 363.

14  ("[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for

15  purposeful discrimination." *Purkett*, 514 U.S. at 768).  *See also Lewis v. Lewis*, 321 F.3d at 830

16  ("[I]f a review of the record undermines the prosecutor's stated reasons, or many of the proffered

17  reasons, the reasons may be deemed a pretext for racial discrimination.")  In step three, the court

18  "considers all the evidence to determine whether the actual reason for the strike violated the

19  defendant's equal protection rights." *Yee v. Duncan*, 463 F.3d 893, 899 (9th Cir. 2006).  A

20  reviewing court must evaluate the "totality of the relevant facts" to decide 'whether counsel's

21  race-neutral explanation for a peremptory challenge should be believed.'" *Ali v. Hickman*, ___

22  F.3d ___, 2009 WL 3401452, at *5 (9th Cir. (Cal.)).  "A court need not find all nonracial reasons

23  pretextual in order to find racial discrimination." *Kesser*, 465 F.3d at 360.

24        The defendant bears the burden of persuasion to prove the existence of unlawful

25  discrimination. *Batson*, 476 U.S. at 93.  "This burden of persuasion 'rests with, and never shifts

26  from, the opponent of the strike.'" *Id.* at 2417 (quoting *Purkett*, 514 U.S. at 768).  However, "the

1  defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory

2  challenges constitute a jury selection practice that permits 'those to discriminate who are of a

3  mind to discriminate.'" *Batson,* 476 U.S. at 96 (quoting *Avery v. Georgia*, 345 U.S. 559, 562

4  (1953)).

### e. Analysis

### I. Prima Facie Case of Racial Discrimination

7       In the order setting the evidentiary hearing in this matter, this court noted that the state

8  court record did not reflect whether petitioner's jury contained any African-American members.

9  November 4, 2008, Order at 5.[9]  In his brief, respondent informs the court that petitioner's jury

10  did, in fact, contain a female African-American juror.  Respondent's Brief at 1, 2.  In support,

11  respondent cites: (1) the testimony of the prosecutor at the evidentiary hearing to the effect that

12  he recalled petitioner's jury contained a female African-American juror, and that he remembered

13  this because the juror complained to the trial judge during trial that petitioner was staring at her

14  and it made her feel uncomfortable, Reporter's Transcript of Evidentiary Hearing (RTEH) at 8-9,

15  26-27; (2) a portion of the transcript of petitioner's trial, during which a juror explained to the

16  trial judge in a hearing outside the presence of the other jurors that petitioner was staring at her

17  during the testimony of a witness and it made her feel uncomfortable, Reporter's Transcript of

18  petitioner's trial (RT) at 2363-66; and (3) a portion of the transcript of jury voir dire, during

19  which counsel for co-defendant Hall stated that "two out of the three prospective jurors, Black

20  jurors have been excused by district attorney," ART at 145.  *Id.* at 2.  Respondent argues that,

21  because petitioner's jury contained one African-American member, the prosecutor's peremptory

22  challenges resulted in the exclusion of only 67% of the eligible African-American prospective

23  jurors, and not 100% of those jurors.  *Id.*  In light of this new information regarding the presence

24  of a black juror on petitioner's jury, respondent "asks this Court to reconsider its previous

25

26       [9]  The California Court of Appeal also noted that the record did not reflect whether any
African-American jurors served on petitioner's jury.  Opinion at 21 n.7.

1    finding of a prima facie case under *Batson*." *Id.*[10]

2           The request to reconsider the previous finding of a prima facie case is denied.  For the

3    reasons previously explained by the court in the November 4, 2008, Order, the circumstances

4    regarding the peremptory challenges to jurors Sallie T. and Veronica M. warranted an

5    explanation to dispel any inference of discrimination, and the trial court's refusal to require an

6    explanation was contrary to controlling Supreme Court authority.  The fact that the prosecutor

7    later accepted the jury with one sitting African-American juror does not dictate a different result

8    on this issue.  The court did not base its ruling on the assumption that there were no black jurors

9    on petitioner's jury.  For the reasons described in this court's previous order, the circumstances

10   at the time of petitioner's objection to the challenge of two African-American jurors gave rise to

11   an inference of discriminatory purpose, establishing a prima facie case which warranted a non-

12   discriminatory explanation.

13                          **ii.  Steps Two and Three of Baston Analysis**

14          Petitioner claims that the prosecutor's reasons for striking Sallie T. and Veronica M.,

15   which he described at the February 2, 2009 evidentiary hearing, were a pretext for racial

16   discrimination.  Accordingly, this court will evaluate the record to determine whether the

17   prosecutor's stated reasons for excluding Sallie T. and Veronica M. from petitioner's jury pass

18   constitutional muster.

19   ////

20   ////

21   ////

22   ////

23

24        [10]  Respondent notes that in the order setting the evidentiary hearing, the court stated that
     "no other circumstances rebut the inference of discrimination arising from the prosecutor's strike
     of the only two African-American jurors in the initial jury pool."  November 4, 2008, order at 17.

25    However, another portion of the order setting the evidentiary hearing clarifies that the court was
     referring here to "the initial pool of 25 jurors who had been called for voir dire" and not to the

26   entire jury pool.  *See id.* at 15, 16.

1          **(a) <u>Sallie T.</u>**

2          At the evidentiary hearing, the prosecutor explained that he exercised a peremptory

3    challenge against Sallie T. because:

4                    She was – her background.  She was a bit of a wreck.  I mean her –
                     a lot of family and – either incarcerated in County Jail or convicted
5                    of various crimes.

6    RTEH at 9.  He stated that those factors "made her absolutely unfit to sit on the jury."  *Id.*  When

7    questioned by petitioner's counsel, the prosecutor stated, "I figured that a prosecutor probably

8    prosecuted him, so there's a tendency, I think, among people, to not be as wild about the D.A.'s

9    office, or the prosecutor if their own family has been convicted."  *Id.* at 29.  He also explained

10   that "early on in the (voir dire) proceedings, I'm likely to use my challenges a little more

11   readily."  *Id.* at 39.

12          The second step of the *Batson/Wheeler* analysis is concerned with the "facial validity of

13   the prosecutor's explanation."  *Hernandez*, 500 U.S. at 360.  The court concludes that the

14   prosecutor's stated reason for exercising a peremptory challenge against juror Sallie T.  – the fact

15   that a number of her cousins had been prosecuted and were incarcerated in Sacramento County –

16   was facially race-neutral.  His reasons were not based on the race of Sallie T. and there was no

17   discriminatory intent inherent in his explanation.  *Id.*  This court must therefore employ the third

18   step of the *Batson* analysis to determine whether the prosecutor's race-neutral explanations were

19   sincere or whether they were a pretext for purposeful racial discrimination.  *Kesser*, 465 F.3d at

20   359.

21          In *Snyder v. Louisiana*, 552 U.S. 472, 128 S.Ct. 1203, 1208, 1213 (2008), the Supreme

22   Court stated that the third *Batson* step "involves an evaluation of the prosecutor's credibility,"

23   and that "the best evidence of discriminatory intent often will be the demeanor of the attorney

24   who exercises the challenge."  *Id.* at 1208, 1213 (internal quotation marks and citation omitted).

25   *See also Hernandez*, 500 U.S. at 365 ("the best evidence [of discriminatory intent] often will be

26   the demeanor of the attorney who exercises the challenge"); *Lewis v. Lewis*, 321 F.3d at 830

1   (quoting *McClain v. Prunty*, 217 F.3d 1209, 1220 (9th Cir. 2000)) ("[a] finding of discriminatory

2   intent turns largely on the court's evaluation of the prosecutor's credibility").  During the

3   evidentiary hearing, this court was able to evaluate the prosecutor's demeanor while he was

4   explaining his strikes of Sallie T and Veronica M.  Specifically, the court was able to evaluate

5   "whether the prosecutor's demeanor belies a discriminatory intent."  *Snyder*, 128 S.Ct. at 1208.

6   The undersigned finds the prosecutor to be a very credible witness.  There was no evidence in his

7   demeanor or any other evidence presented that his non-discriminatory explanation lacked

8   credence.  In light of those credible, race-neutral explanations, the court finds that the strikes of

9   Sallie T. or Veronica M. were not for discriminatory reasons.[11]

10         Another relevant circumstance in determining whether a prosecutor excused a juror with

11   discriminatory intent is a comparative juror analysis.  *Boyd*, 467 F.3d at 1145.  *See also Kesser*,

12   465 F.3d at 360 (the "totality of the relevant facts" includes "the characteristics of people [the

13   prosecutor] did not challenge").  Petitioner points out that alternate jurors 1 and 2 also had

14   relatives who had been convicted of crimes and sentenced to prison.  Specifically, the brother-in-

15   law of alternate juror 1 went to prison in Arizona for assault with a deadly weapon 17 years prior

16   to petitioner's trial.  Petitioner's Exhibit A-1 at 000063.  The brother-in-law of alternate juror 3

17   was killed by his wife.  *Id.* at 000077.  The wife was subsequently convicted of this murder.  *Id.*

18   at 000078.  Like Sallie T., both of these jurors stated that these circumstances would not impact

19   their ability to be fair.  *Id.* at 000063, 78.  In addition, similar to Sallie T., alternate jurors 1 and 3

20   were established members of the community with nothing else on their questionnaires to

21   disqualify them from serving on petitioner's jury.  However, the prosecutor did not excuse these

22   jurors.

23

24         [11]  Although the undersigned did not observe the jury selection process first-hand and was
     not able to see the jurors and potential jurors, the prosecutor's stated reasons for excluding Sallie
     T. and Veronica M. did not involve their demeanor.  Therefore, it was less important for this

25   court to view the jurors themselves.  *Cf. Snyder*, 552 U.S. at ___, 128 S.Ct. at 1208-09 (where
     the prosecutor's reasons for excluding an African-American juror were based, in part, on the

26   juror's nervous demeanor, the trial court's first-hand evaluation of the juror was critical).

When asked about alternate juror 1, the prosecutor explained:

Q.  Alternate No. 1 is a fellow by the –

A.  Yes.

Q.  – name of Pacheco.  What is it you liked about him?

(Pause – reviewing exhibit.)

A.  This questionnaire, he looks like a great juror, but I see that he mentions in the – during the voir dire is it –

Q.  Brother-in-law is in –

A.  His brother-in-law in state prison.

Q  – state prison for assault with a deadly weapon.  Correct?

A.  Yeah.  I don't generally like that, at least – and I don't know, you know, what the – but I guess I would be – since we're sitting on the main jury, you know, you only have a number of times you can kick people.

As alternatives, it's very different than obviously what I had, almost 35 or 40 challenges in the group.  So I had to be more careful.

This person would not have made it through in my main 12, and I guess I'm faced with the same situation that any defense lawyer is too, is that alternate jurors, they do sometimes end up on the jury, and you hope that they don't, but you – it's not possible to take the same – to use the same criteria with alternates, because you don't have as many challenges, and you just – and you don't – and you can also look to see, to a degree, you can generally – there's usually a few people there you can see who's coming up next.  And what you hope is that if they end up on the jury, that the judge uses a random selection for the alternates, instead of in order.

Q.  But is it fair to say, and I could be wrong, but I haven't found anyplace in the record where you exercised any peremptory challenges with respect to alternates; correct?

A.  Yeah.  I don't see that either.

Q.  And you did have peremptory challenges; correct?  Probably five, minimum of three?

A.  Yeah, I would think three, but you're right, it could have been as many as five.

1       Q.  Because defense would have had three plus joint two perhaps?
I don't know.  I'm making it up as I go along.  But we agree that
2       you would have had at least a minimum of three?

3       A.  I would have had at least three.  I would have had at least three.
But this is – you know, that's the part where you say, you know,
4       towards the end of a jury, and you start to look, and you have –

5       Q.  Sure.

6       A.  You're looking out in the audience, and if you don't like
what's coming, you sometimes have to just take what you have
7       and hope that the [sic] don't end up on the jury.

8  RTEH at 52-53.

9       When the prosecutor was asked about alternate juror 3, the following colloquy occurred:

10       Q.  Why did you like her?

11       (Pause – reviewing exhibit.)_

12       Q.  The transcripts are behind the tab.

13       A.  Yeah.  I'm just kind of reviewing it, just trying to figure out
what it was saying here.
14
       (Pause – reviewing exhibit.)
15
       A.  I can tell you I don't have any independent recollection.  I can
16       see things as to why I would have, but –

17       Q.  You can see things what?

18       A.  I can see things in here as to – you know, that I would consider
okay, and I can see a couple of things in here that would concern
19       me, so –

20       Q.  Yeah.  The fact that her brother-in-law was killed by his wife;
correct?
21
       A.  Yeah.  I don't know – I'd like to know information – as I look
22       at that right now, I'd like to know more information about that if I
were going to choose this person as a juror now.  I don't know
23       what the details were.

24  *Id.* at 51.

25       The prosecutor testified that he does not "look at alternate jurors the same as I do my

26  main group."  *Id.* at 45.  First, he had fewer peremptory challenges with respect to the alternates.

1   Second, the prosecutor explained that the selection of alternates comes at the end of the jury

2   selection process, and "if you don't like what's coming, you sometimes have to just take what

3   you have and hope that the[y] don't end up on the jury."  *Id.* at 45, 53.

4        Petitioner also argues that juror Linda K., who was passed by the prosecutor but

5   ultimately excused by the defense, is comparable to Sallie T.  Both Ms. K. and her husband

6   worked for the California Department of Corrections.  ART at 134.  However, like Sallie T., Ms.

7   K had a relative who was in prison.  Her brother was convicted of a "drug-related assault" and

8   was incarcerated in Southern California.  *Id.* at 131.  The prosecutor passed three times with

9   Linda K. on the jury.  RTEH at 34-35.  When asked why, he explained:

10             Q.  And you did that on the strength of what, her relationship to
              CDC and to – relationship to CDC and law enforcement?

11

12             A.  I did it on the strength of the fact that I knew the defense
              lawyers would kick her off.  Or I gambled that they would, and
              they did.

13

14             I did the same thing with Mr. Becker, he was a juror I passed four
              times on and –

15             Q.  Mr. who?

16             A.  Becker.  I passed on him four times before the defense kicked
              him off.  I mean, because I had a lot more challenges than the

17             defense.

18             Q.  Sure.

19             A.  So I could take those, and there was – there were a lot of jurors
              that the defense needed to kick off because they had a lot of law

20             enforcement background, and you know, they gambled – the
              defense lawyer will gamble the same way a D.A. might on

21             something like that.  They can't – they need to kick somebody off
              who's got a law enforcement background because they just don't

22             know for sure what they're going to do.

23   *Id.* at 35.

24        In short, the prosecutor provided credible, non-discriminatory reasons for each of his

25   decisions in question regarding the use of his peremptory challenges.  He explained that he

26   excused Sallie T. because "a lot" of people in her family had been locally prosecuted for armed

                                        33

1   robbery and "muggings."  He explained that he did not excuse two alternate jurors who each had

2   one family member who had been convicted of a crime because they were alternates and he did

3   not "use the same criteria" with alternates.  The prosecutor also mentioned that he had fewer

4   challenges with alternates and therefore fewer opportunities to "kick people."  With regard to

5   juror Linda K., who also had a family member in prison, the prosecutor explained that he

6   believed the defense would challenge her so he did not waste a peremptory challenge on Linda

7   K.

8          Petitioner argues that the prosecutor's explanation that he passed with Linda K. on the

9   jury because of his belief that the defense would excuse her, and not because of the more

10  obvious reason that she had a law enforcement background, is a "palpable lack of forthrightness"

11  that "must weigh heavily against his overall credibility."  Petitioner's Brief at 20.  The court

12  disagrees.  Although the prosecutor's strategy was a gamble, it is certainly not implausible or

13  fantastic.  It is not improper for a prosecutor to rely on his instincts with respect to the voir dire

14  process.  *See United States v. Power*, 881 F.2d 733, 740 (9th Cir. 1989) (quoting *United States v.*

15  *Chinchilla*, 874 F.2d 695, 699 (9th Cir. 1989)).  Further, the prosecutor appeared to this court to

16  be sincere when he testified that this was his actual reason for passing the jury several times with

17  Linda K still seated.

18         It is true that the prosecutor's justification for excusing Sallie T. is undermined by the

19  fact that juror Linda K. and alternate jurors 1 and 3 also had relatives who had been prosecuted

20  for violent crimes.  The prosecutor could have used some of his peremptory challenges to excuse

21  these jurors but chose not to do so.  The fact that the prosecutor's proffered reason for striking

22  Sallie T. also applies to these sitting jurors is arguably "evidence tending to prove purposeful

23  discrimination to be considered at *Batson's* third step."  *Miller-El*, 545 U.S. at 241.  Further,

24  although the prosecutor explained that he did not want to use up his peremptory challenges on

25  the alternate jurors, the record reflects that he exercised no challenges with respect to the

26  alternates.  Thus, this fact can be viewed as undermining that particular justification.  *See*

34

1   *McClain*, 217 F.3d at 1221 ("The fact that one or more of a prosecutor's justifications do not

2   hold up under judicial scrutiny militates against the sufficiency of a valid reason").[12]  However,

3   the fact that an excused juror shares one or more characteristics with seated jurors does not end

4   the inquiry into discrimination in jury selection, nor does it establish that the prosecutor was, in

5   fact, acting with discriminatory intent.  Rather, the court must evaluate the "totality of the

6   relevant facts" to decide whether "counsel's race-neutral explanation for a peremptory challenge

7   should be believed."  *Ali*, 2009 WL 3401452, at *5.  Here, the prosecutor's testimony explaining

8   his decisions was credible.

9          The similarities between Sallie T. and several of the seated jurors do not undermine the

10  prosecutor's stated reason for excusing Sallie T. under the facts of this case.  Unlike Sallie T.

11  there is no evidence that the relatives of the alternate jurors or Linda K. were prosecuted by the

12  same district attorney's office in which this prosecutor was employed.  The prosecutor

13  specifically referred to his concern that someone whose relative was prosecuted by "the D.A.'s

14  office" might be less sympathetic to the prosecutor in this case.  Further, Sallie T. stated that she

15  had "numerous people" in her family in jail.  This was not true of alternate jurors 1 and 3 or juror

16  Linda K.  The prosecutor explained that he did not use the same criteria with alternates that he

17  did with his "main group" of jurors.  Although he did not exercise any challenges with respect to

18  his alternates, his use of a less rigorous standard with respect to jurors who will probably not be

19  involved in the deliberations is not implausible or unbelievable.  Further, petitioner's jury did

20  contain one African-American juror.  "The fact that African-American jurors remained on the

21  panel 'may be considered indicative of a nondiscriminatory motive.'"  *Gonzalez v. Brown*, ___

22  F.3d ___, 2009 WL 3489426, at *5 (9th Cir. (Cal.) (quoting *Turner v. Marshall*, 121 F.3d 1248,

23

24  [12]   The prosecutor could not remember why he failed to exercise a strike against alternate
    juror 3.  Any speculation or guess as to why he might have retained this or any other juror is
    irrelevant to the issues before the court and will not be considered.  *See Paulino v. Harrison*  542

25  F.3d 692, 700 (9th Cir. 2008) (a prosecutor's mere guess as to why she might have removed
    certain jurors does not provide circumstantial evidence of her actual reasons and is insufficient to

26  meet the state's burden of production).

1254 (9th Cir. 1997)).  *See also Burks v. Borg*, 27 F.3d 1424, 1429 (9th Cir. 1994) (fact that jury

contained an African-American member is "a valid, though not necessarily dispositive,

consideration in determining whether a prosecutor violated *Batson*").  Finally, as discussed, the

undersigned finds the prosecutor to be a credible witness overall.

After a review of the entire relevant record, the court concludes that the prosecutor's

stated reason for excusing Sallie T. was his genuine reason for exercising a peremptory strike,

rather than a pretext invented to hide purposeful discrimination.  Accordingly, petitioner has

failed to carry his burden of proving the existence of unlawful discrimination with respect to the

prosecutor's challenge to Sallie T.

### (b).  Veronica M.

At the evidentiary hearing, the prosecutor explained that he exercised a peremptory

challenge against Veronica M. because she "had sat on a prior jury that had hung" and because

she worked for the "Department of disability, Adult Services," which struck him as a job that

was "social worker-esque."  RTEH at 10.  He explained,

> Veronica Moseley.  There were two reasons for Veronica Moseley.
> One is that she did not – she had sat on a prior jury that had hung.
> Those are always tough calls for sure.  You don't know exactly,
> because we don't ask them if they were for prosecution or against.
>
> So typically that's – it's a factor that you have to consider, and you
> know, you never know which direction for sure.  They might have
> been prosecution jurors.  They might have been defense.  It's
> usually one of those things that you just – it's hard, but you can't
> take a risk, so typically, I would remove people, but now always.  I
> mean, it just depended on other factors as well.
>
> But she also had another strike against her in my mind, that she
> worked for Department of disability, Adult Services, and although
> I would have liked to have done follow-up questioning with
> somebody with a background like that to find out exactly what it is
> they do on a day-to-day basis at work, Judge Ford did not allow us
> to ask questions, and Judge Ford did not ask a lot of questions
> himself.
>
> So you were stuck, and I was certainly stuck with the bare
> minimum of what they do for a living, and whether that factors
> into some sort of preconceptions I have about that type of work,

> and in her case, she seemed – it seemed a little more social worker-
> esque, if I can use that term.  And people in the helping
> professions, as a rule, I'm cautions about.  It doesn't always apply,
> but it's a rule of thumb that I look at, and in her case, I certainly
> did, and so the combination of those two things for me was
> sufficient for me to dismiss her for – or use a peremptory challenge
> on her."

*Id.* at 10-11.  Later in the proceedings, the prosecutor explained that, while Veronica M. had a

brother in law enforcement, that positive factor "didn't necessarily overcome the fact that she

had sat on a prior hung jury and that she had this other – her employment history was a little

more in the social work kind of vein."  *Id.* at 36.

As in the case of Sallie T., the prosecutor's stated reasons for exercising a peremptory

challenge against Veronica M. are facially race-neutral.  Accordingly, the court moves to the

third step of the *Batson* analysis.  Standing alone, the prosecutor's reasons are recognized

grounds for a peremptory challenge.  *See*, *e.g.*, *United States v. Thompson*, 827 F.2d 1254, 1260

(9th Cir. 1987) ("Excluding jurors because of their profession, or because they acquitted in a

prior case . . . is wholly within the prosecutor's prerogative").  However, the question at the third

step of the *Batson* analysis is whether these are the actual reasons for the prosecutor's strike of

Veronica M., or simply a pretext.

Petitioner argues that Veronica M. had the same characteristics as juror Medina, who was

excused by the defense but passed by the prosecutor twice.  As described above, Veronica M.

had served on a hung jury and her brother worked for the Department of Corrections.  Juror

Medina, who was Hispanic, had also served on a jury that was unable to reach a verdict.  In

addition, he had several relatives with a law enforcement background, which was arguably a

factor favorable to the prosecution.  Petitioner's Evidentiary Hearing Exhibit 1, tab marked

"Medina;" Petitioner's Post-Evidentiary Hearing Exhibit A-1, at 000088.  When asked why he

did not exercise a peremptory challenge against juror Medina, the prosecutor explained:

> Q.  I want to talk about another juror that you did pass on while he
> was on the panel, a Mr. Frederick Medina.  Do you recall any
> information about Mr. Medina's background?

37

A.  I do recall.  He has several people in law enforcement in his background.  He had – I think there was a brother-in-law, or something like that was a CHP, there was somebody else in the police department or something of that nature, and then he had somebody that he knew in the Department of Corrections.  That's what – I remember he had that.  He was an engineer, I think for the Air Resources Board as well.

* * *

Q.  Now, do you recall whether – well, there's information in the record that he had served on a jury that had also failed to reach a verdict.  Do you recall why you chose to pass while Frederick Medina was on the panel?

A.  If I could point out, although I passed, I had – was – he was removed by a defense attorney before we were even finished selecting the jury.  It really ultimately would have depended on what that final jury makeup was if I would have exercised a challenge on him.

My guess is I would have ultimately removed him myself, but a defense attorney did it for me, and that's one of the things you do, I think, as a trial lawyer is, it's always a certain bit of playing poker and – or even chess, depending on what you're – how you want to make the comparison, but I always viewed it as I want to use the least number of challenges I can to stay ahead of the defense, so I don't get stuck letting the defense attorney chose [sic] the jury that ultimately sits.

And in this case, I had an equal number of challenges, but the defense attorney – I mean, they had to burn through several of the people on the jury.  They typically remove people with law enforcement backgrounds, and sometimes some of those same people with law enforcement backgrounds for some reason I don't want on there.  And so – but I can safely wait, because I know they're going to kick, and in this case I had three defense lawyers who rarely agreed on anything.

So I knew that one of them was going to kick several of the jurors that I ultimately didn't want.  So I passed on a lot of jurors that I didn't want, Mr. Medina being one of those that if it came down to it at he [sic] end of the jury, and I'm looking around at that jury, maybe I would have kept him because it would have balanced out because he did have a lot of law enforcement.

But it was one of those strategic gambles I guess I engaged in, and in this case, the ultimate – my final decision was made easy for me by the defense attorney.

RTEH at 12-13.

38

Petitioner also points out that there were other jurors whose jobs appeared to be "social worker-esque," thereby placing them in the same category as Veronica M.  For instance, Juror 12 was a retired Job Corp coordinator and had no "offset, such as family or friends involved in law enforcement."  Petitioner's Brief at 14; Petitioner's Evidentiary Hearing Exhibit A at 000058-59. Juror 11 worked for Young Health Systems, where he admitted patients for surgery.  Petitioner's Evidentiary Hearing Exhibit A at 000055.  Juror 3 was a retired registrar from the Sacramento City Unified School District.  *Id.* at 000021.  In addition, petitioner provides evidence that Veronica M. was "an office worker," and that her job duties probably did not involve actual social work.  Petitioner's Brief at 13-14.  He argues that the prosecutor's conclusion that she was "a social worker of any sort is pure, unadulterated speculation on his part, without any basis in fact, or record to support it."  *Id.* at 13.

Petitioner's argument that Veronica M. was an office worker and not a social worker is a red herring.  First, it appeared that the prosecutor was more concerned about where Veronica M. worked than the exact nature of her duties.  Second, he was not allowed to ask voir dire questions.  Therefore, he was unable to question Veronica M. about the particulars of her job and had to use his instincts, to some extent, to gain a sense of each particular juror.  Under these circumstances, a comparison of the job duties of various jurors to determine whether their employment was actually in the nature of social work is not particularly helpful.  More relevant to the *Batson* analysis is the fact that none of the above-described jurors had also served on a hung jury, as had Veronica M.  The prosecutor explained that it was the "combination" of the two negative factors that caused him to challenge Veronica M.

Petitioner also compares Veronica M. to Juror 1.  Juror 1 had served on a hung jury and "was a true social worker, a chaplain."  Petitioner's Brief at 15.  Like Veronica M., juror 1 had lived in Sacramento County for over 20 years.  At the evidentiary hearing, when asked why he chose to keep juror 1 on the panel when he had seemingly identical negative characteristics to Veronica M., the prosecutor responded as follows:

A. . . . Mr. Stengland – this is again one of those reasons why you can't have – I think as a lawyer you can't have hard and fast rules of who you kick and who you don't kick. Mr. Stengland is one of those guys who has – I would definitely consider him to be in the helping professions, which I'm typically cautious about, but I was not of him, because my father is a minister, and two of my brothers are.

And so it – so as – because I have so much experience, I guess, with people that I know that are close to me, that are ministers, the fact that he's a chaplain, I think I have a certain insight into what they do and how they think that makes me somewhat more favorable towards keeping someone like them. He was – this guy had multiple – you know, he had children, he was married, he's lived in the county for well over 20 years, and clearly invested.

And then you had the – then you balance that with the jury issue. He had the – he had a civil jury he sat on where they reached a verdict, a criminal case they did not reach a verdict, and then I think he was called one other time, and I don't think he ultimately sat on a jury.

So I balanced that out. Here's a guy that he has a mixed bag, one case where they did reach a verdict, one case where he did not, but ultimately, I'm comfortable with him, and he just reminded me a lot of my dad. My dad in my mind is [sic] the ultimate juror. I mean, I think he's smart, he's compassionate, he's not – and I think he would be fair, and I think he also has a certain ability because of what he does to sift through the – I guess some of the things that happen in court, which is either the questioning, or the way witnesses act, the – some of the drama of a courtroom can throw some people. And I think because of what he does for a living, and the kind of things he encounters, I just think he would make a good juror. And that's what I thought about with Mr. Stengland, he just – he seemed like he would be a good juror to me.

RTEH at 14.

Again, the prosecutor explained in a credible manner the non-race based reasons for his decision. He testified that he excused Veronica M. because she had served on a hung jury and she also worked in a profession that appeared to him to be in the "helping profession," or "social worker-esque." He passed the jury with juror Medina, who had also served on a hung jury, because he expected the defense would eliminate him. He accepted juror Stengland, who had both of the negative characteristics of Veronica M., because Stengland reminded him of his

1  father and he felt his father would be a model juror.

2      The court notes that the prosecutor's reason for passing a jury which contained juror

3  Medina was equally applicable to Veronica M.  Both of these jurors had relatives who were in

4  law enforcement.  The prosecutor was not asked, and he did not explain, why he did not wait for

5  the defense to excuse Veronica M. before excusing her himself, as he did with juror Medina.

6  However, the prosecutor explained that he struck Veronica M. because she had two "strikes"

7  against her: the fact that she had served on a hung jury and the nature of her job.  Juror Medina

8  worked for the Air Resources Board, which is not an entity that could be described as "social

9  worker-esque."  Therefore, Medina did not have the second "strike."  The fact that juror Medina

10  shared one characteristic with Veronica M. is not necessarily dispositive of the *Batson* issue.

11  Veronica M. was excused because of the combination of two negative factors, and not just

12  because she had served on a hung jury.  *Cf. Ali*, 2009 WL 3401452, at *6 (quoting *Kesser*, 465

13  F.3d at 360) ("where 'an evaluation of the voir dire transcript and juror questionnaires clearly

14  and convincingly refutes *each* of the prosecutor's non-racial grounds, we are "compell[ed] [to

15  conclude] that his actual and only reason for striking [the relevant juror] was her race")

16  (emphasis added).  The court also notes that the prosecutor had only exercised nineteen of his

17  thirty-five peremptory challenges when the jury, with one African-American on the panel, was

18  finally accepted by all parties.  Respondent's Brief at 1.  This factor is a "relevant circumstance"

19  in determining whether unlawful discrimination has taken place in jury selection.  *See Gonzalez*,

20  2009 WL 3489426, at *5 (noting that "the prosecutor still had six peremptory strikes that she

21  could exercise – quite a few – and she did not excuse any of the remaining African-American

22  jurors").  Finally, the court notes that the prosecutor testified he might have removed Mr. Medina

23  himself but was spared the use of another strike when the defense challenged Medina before jury

24  selection was completed.  Although there is no evidence either way, the dynamics of jury

25  selection point out the difficulty in assessing a prosecutor's true intentions, especially when, as

26  here, those intentions cannot be interpreted using an analysis of questions the prosecutor asked

1  potential jurors during voir dire.  *See Miller-El*, 545 U.S. at 238 ("the rub has been the practical

2  difficulty of ferreting out discrimination in selections discretionary by nature, and choices

3  subject to myriad legitimate influences, whatever the race of the individuals on the panel from

4  which jurors are selected").

5        With regard to juror 1, the prosecutor explained that his instincts and experience with his

6  family caused him to accept this juror, even though he shared the same two negative "strikes"

7  with Veronica M.  He was also aware that juror 1 had served on one jury that was able to reach a

8  verdict, thereby neutralizing, to some extent, the fact that he had also served on a jury that was

9  unable to reach a verdict.  As explained above, instinct and subjective factors have a legitimate

10  role in the jury selection process.  *Id.*, 545 U.S. at 252; *Burks*, 27 F.3d at 1429, n.3 ("peremptory

11  strikes are a legitimate means for counsel to act on . . . hunches and suspicions").  The

12  undersigned believed the prosecutor when he explained why he chose to keep juror 1 on the

13  panel even though he looked, on paper, to be identical to Veronica M. in terms of "strikes"

14  against him.  Put another way, the prosecutor's demeanor did not "belie[] a discriminatory

15  intent."  *Snyder*, 552 U.S. ___, 128 S.Ct. at 1208.

16        Overall, the validity of the prosecutor's decision to challenge Veronica M. appears on the

17  surface a close question.  However, after an analysis of the "totality of the relevant facts,"

18  including an assessment of the prosecutor's credibility on the witness stand, the fact that the

19  prosecutor was not allowed to question any of the potential jurors himself, the fact that some of

20  the prosecutor's reasons stand up to close scrutiny and none are false or based on stereotypes of

21  any particular race, and the fact that one African-American juror sat on petitioner's jury, this

22  court concludes that the prosecutor's peremptory challenge of Veronica M. was not motivated by

23  the race of this juror.

24  ////

25  ////

26  ////

**IV.  Conclusion**

Accordingly, for all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  December 21, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE